## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

|  |  |  |
|---|---|---|
| MATTHEW STEPHEN AKINS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 2:15-CV-4096NKL |
| vs. | ) | |
| | ) | Jury Trial Demanded |
| ROB SANDERS, et. al., | ) | |
| Defendants | ) | |

## PLAINTIFF MATTHEW STEPHEN AKINS' RESPONSE TO THE CITY'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Matt Akins by agreement with Defendants, reincorporates and states fully

herein by reference his motion for partial summary judgment as if fully pleaded herein.

## TABLE OF CONTENTS

1. Table of Contents...............................................................................................
2: Table of Authorities............................................................................................
3. Statement of Disputed Facts...............................................................................
4: Supplemental Statement of Fact by Akins...........................................................
5: Argument...........................................................................................................
6: Conclusion.........................................................................................................
7: Certificate of Service and Compliance................................................................

## TABLE OF AUTHORITIES

*Arizona v. United States*, 132 S. Ct. 2492, 2528 (2012).........................................35
*United States v Comstock*, 130 S.Ct. 1949, at 1980................................................36
*Printz v. United States*, 521 U.S. 898 (1997)........................................................36
*Texas v. White,* 7 Wall., at 725............................................................................36
*Coleman v. Watt,* 40 F.3d 255 (8th Cir. 1994).......................................................41
*Lathon v. City of St. Louis,* 242 F.3d 841 (8th Cir. 2000).......................................41
*Mr. Lucky Messenger v. United States,* 587 F.2d 15 (7th Cir. 1978).........................41
*State v. Sledd,* 949 S.W. 2d 643 (Mo.App. W.D. 1997)...........................................42
*Jenkins v. Missouri Farmers Ass'n, Inc.,* 851 S.W.2d 542 (Mo.App.1993)...............42
*State v. Residence Located at 5708 Paseo, Kansas City, Mo.,* 896 S.W.2d 532 (Mo.App. W.D.1995)............................................................................................43

*State ex rel., MacLaughlin v. Treon*, 926 S.W. 2d 13 (Mo W.D. 1996)....................43
*Missouri State Highway Patrol v. Atwell*, 119 S.W.3d 188 (Mo. W.D., 2003)..........44

*City of Canton, Ohio v Harris*, 489 U.S. 378 (1989)................................................45

*Polk County v. Dodson*, 454 U.S. 312 (1981)..........................................................45
*Parrish v. Ball*, 594 F.3d 993 (8th Cir 2010)...........................................................45
*Brockinton v. City of Sherwood*, 503 F.3d 667 (8th Cir 2007)...............................46

## STATUTES

Brady Handgun Prevention Act, 18 U.S.C. § 922.....................................................36
RSMo. 542.301 (2008)...............................................................................................38
RSMo. 513.600. (2008) Sections 513.600 to 513.645.........................................39-42

## AKINS' RESPONSE TO THE CITY'S STATMENTS OF FACT(S)

### I.  CITY'S PURPORTED "Statement of Uncontroverted Facts"

#### a.  May 9, 2010 Incident

##### i.  *Arrest by Officer Hughes.*

1.  On May 9, 2010, Officer Eric Hughes stopped Mr. Akins at a routine DWI check point in Columbia, Missouri.  Deposition of Matthew Akins, attached hereto as Exhibit 1 and incorporated herein by reference, at 51:10-25. **ADMITTED**

2.  Officer Hughes smelled a strong odor of marijuana coming from inside Mr. Akins' vehicle, observed that Mr. Akins' eyes were bloodshot, and determined that Mr. Akins was acting nervously, including having shaking hands. May 17, 2016 Eric Hughes Affidavit, attached hereto as Exhibit 29 and incorporated herein by reference, at ¶¶ 9-10; May 18, 2010, Probable Cause Statement, attached hereto as Exhibit 2 and incorporated herein by reference, at ¶ 2; Columbia Police Department Offense Report 2010-005073, attached hereto as Exhibit 3 and incorporated herein

by reference, at pg. 4. **DENIED** generally, admit that Mr. Akins' eyes were bloodshot. See City Ex. # 1 Hughes initially asked Akins and his passenger if they were drinking. When Akins and his passenger responded negatively. Hughes responded "Well, you've been doing something. Step out of the car." Hughes initial statements centered around alcohol and he never made any indication of (City Summary Judgment Exhibit 1, Akins Depo Pg. 51 lines 10-20; see also Akins supplementary Affidavit attached to this response as Exhibit # 44). Further no drug tests, either field test or lab tests, were conducted of this alleged marihuana and the substance in question was destroyed by the City pursuant to Court order (See Akins Exhibit # 12 page 1) See Also that Akins, through his attorney, requested that all videos from the checkpoint be turned over to dispute Hughes account of the incident. Hughes failed to retain (or possibly deleted) every single video of the incident, transportation, and booking of Akins. (Akins Affidavit Ex #2, Prosecutors notes Akins Ex #25)

3. Based on his training and experience, Officer Hughes believed that Mr. Akins' actions were indicative of an individual who was using or possessing a controlled substance. Exhibit 29, at ¶ 11. **DENIED,** SEE Akins Ex. 2, Akins Ex. 5 and Akins 2d Affidavit Ex. #44 attached hereto. With the exception of shining a light in Mr. Akins' eyes no other Field Sobriety Tests, (FST's) breath tests or blood tests were conducted. Officer Hughes was working a DWI Checkpoint but made no arrest or allegation in his probable cause statement of impaired driving. The unexplained loss of the CPD video from the checkpoint, booking room, etc. all raise reasonable inferences against this speculative assertion.

4.     Officer Hughes asked Mr. Akins to exit his vehicle (Exhibit 1, at 51:10-23) and conducted a protective patdown of Mr. Akins (Exhibit 3, at pg. 4). **ADMITTED** that he ordered Akins to exit the vehicle after opening his car door (See Akins Ex#2)

5.     During the patdown, Officer Hughes felt a gun near Mr. Akins' waist. Exhibit 1, at 52:17-20; Exhibit 3, at pg. 4. **ADMITTED**

6.     Mr. Akins did not inform Officer Hughes of the presence of the gun prior to the patdown. Exhibit 3, at pg. 4. **ADMITTED** See Akins' Affidavit Ex. 2 and City Ex. 1 at 51: lines 10-23, Officer Hughes opening Akins' door and ordering him to exit the vehicle did not provide reasonable time for said notification.

7.     Marijuana was found in Mr. Akins' jeans pocket and in a plastic bag under the front driver seat of Mr. Akins' vehicle. Exhibit 3, at 4-5. **DENIED**, Defendant's exhibit is speculative of the nature of the material. No field test nor Highway Patrol lab test was conducted on this suspected marihuana.(See Akins Ex 12 page 1 (ECF 91-10)) CPD requested an order authorizing the destruction of the suspected marihuana that was approved but no analysis was conducted confirming its true nature. Further Akins Ex. 5 CPD Police reports

8.     Mr. Akins was arrested for possession of an illegal substance and unlawful use of a weapon. Exhibit 2, at ¶ 1; Exhibit 3, at 5. **ADMITTED**

9.     Mr. Akins admitted in his deposition that during the period when he was arrested by Officer Hughes, Mr. Akins was using marijuana and could have had it on him at the time of the arrest. Exhibit 1, at 71:2-6, 56:22-24. OBJECTION, NOT A STATEMENT OF FACT WITHIN THE MEANING OF THE RULE and therefore DENIED as speculative, further The section of the deposition listed does not support

the listed item. Akins did not state that he was using marijuana, only that it was possible during the general time frame that he may have used marijuana. (City Exhibit 1 at 71:2-6) Akins clarified he was not under the influence of marijuana at the time of the arrest and only occasionally used marijuana in the months surrounding the arrest. (Akins Supplementary Affidavit Ex. #44) In which he clarifies he had not used marihuana in at least the 24 hours prior to this traffic stop nor been in the presence of marihuana smoke during this same period of time.

10. Mr. Akins was charged with a Class D Felony. Judgment in Boone County Case No. 10BA-CR02245, attached hereto as Exhibit 10 and incorporated herein by reference. **ADMITTED,** that Mr. Akins was charged for unlawfully concealing a firearm in the passenger compartment of his motor vehicle despite being entitled to the statutory exemption that entitled him to lawfully do this act. (Scc Akins Exhibit #2, #44 & # 46 Mo Highway Patrol brochure on the state of Missouri concealed weapons law in May 2010)

### ii. *Mr. Akins' Firearm*

11. Mr. Akins' charges as a result of the May 9, 2010, arrest were not dismissed until November 16, 2010. Exhibit 10. **ADMITTED**

12. At that time, Mr. Akins' charges were dismissed *nolle prosequi*, the prosecutor's formal entry on the record indicating that he will no longer prosecute a pending criminal charge. Exhibit 10. **ADMITTED**

13. The Boone County Prosecutor's Office did not inform the Columbia Police Department that Mr. Akins' firearm was no longer needed until March 20, 2013. March 20, 2013, Correspondence between CJ Dykhouse and Michelle Heater, attached

hereto as Exhibit 9 and incorporated herein by reference; May 16, 2016 Michelle

Heater Affidavit, attached hereto as Exhibit 33 and incorporated herein by reference, at

¶ 11. **DENIED** The Affidavit of Michelle Heater only speaks to her personal

knowledge and not the knowledge of the Columbia Police Dept. of the case being

dismissed on November 16, 2010. (See Akins Ex 12, page 3 (City Bates stamped 432)

'File Number 019-230602 , 1/3/2011 4:22:30 PM,  Notes: 11-16-10 nolle pros

(johnson)" and the under "EVENTS: 11/16/2010 (code) DPNP (event text) Count I

Nolle Prosequi"  Establishing by at least January 03, 2011, the Columbia Police

Department had actual knowledge of the nolle prosequi dismissal of the only charge

against Matt Akins on November 16, 2010.

14.   Following the dismissal of the charges against Mr. Akins, Mr. Akins did not

communicate with the Columbia Police Department until October 24, 2012, regarding

the return of his firearm.  Exhibit 8.  **DENIED** (See Exhibit Akins #10) Akins' attorney

Mike Hamilton communicated with Prosecutor Roger Johnson on February 01, 2012,

for communication to CPD to release his firearm. (See also Akins Ex #44)

15.   This was only after the Columbia Police Department discovered they still had the

firearm, through a routine audit, and notified Mr. Akins on October 18, 2012, via a

letter.  October 24, 2012 Phone Conversation between Michelle Heater and Matthew

Akins, attached hereto as Exhibit 8 and incorporated herein by reference; Exhibit 1, at

438:21-23; Exhibit 33, at ¶ 3. **DENIED** SEE AND INCORPORATE RESPONSE TO #

13 ABOVE AND MISSOURI STATE LAW PLACES AN AFFIRMATIVE

OBLIGATION ON THE CITY WITH REGARD TO SEIZED PROPERTY SEE

ARGUMENT BELOW

16. The letter informed Mr. Akins that he could not pick up the firearm himself, but that a third party could pick up the firearm. Exhibit 7; Exhibit 33, at ¶ 5. **ADMITTED**

17. The Columbia Police Department could not release the firearm to Mr. Akins because Mr. Akins had been charged with a felony related to a separate incident. Exhibit 7. Objection and **DENIED** not a statement of within the meaning of the law and an incorrect understanding of federal law

18. On October 18, 2012, Captain Brian Richenberger authorized the evidence unit to release Mr. Akins .380 Bersa hand gun to Mr. Akins through a third party transferee. Captain Richenberger indicated that Mr. Akins was currently prohibited from possessing firearms because he was awaiting felony trial pursuant to 18 U.S.C. § 922(n). *See* October 5, 2012 Columbia Police Department Evidence Unit Criminal History NCIC/MULES Request for Release of Firearm, attached hereto as Exhibit 5 and incorporated herein by reference. OBJECTION NOT a statement of fact but **ADMITTED** THAT IS WHAT THEY ARE CLAIMING

19. This was explained to Mr. Akins over a phone call on October 24, 2012. October 24, 2012 Phone Conversation between Michelle Heater and Matthew Akins, attached hereto as Exhibit 8 and incorporated herein by reference. Objection as to "What" was explained and therefore **DENIED** Akins did not receive an explanation or mention of any Federal laws that may be related to the return of a seized firearm. He received no explanation or mention of Captain Brian Richenberger or his involvement in the process. (Recorded phone call between Heater and Akins not included in City's evidence but used as reference to dispute this fact)

20. Mr. Akins confirmed that he understood he could not pick up the firearm himself, but

could have a third party pick up the firearm.  Exhibit 8. OBJECTION Mr Akins "Understanding" is not a statement of fact within the meaning of the Rule and therefore **DENIED**. Akins understood the department had chosen not to release his weapon based on the pocket knife charge but had not received an explanation regarding the legalities of this decision. (Akins Supplemental Affidavit Ex #44)

21.   Mr. Akins did not arrange for a third party to come pick up the firearm and did not contact the Columbia Police Department again regarding the firearm until February 22, 2013.  Exhibit 33, at ¶¶ 9-10; February 22, 2013 Correspondence between Ken Burton and Matthew Akins, attached hereto as Exhibit 11 and incorporated herein by reference. **DENIED** City's Ex 33does not support this proposition

22.   Chief Ken Burton was first informed of Mr. Akins' request to have his firearm returned on February 22, 2013.  May 16, 2016 Ken Burton Affidavit, attached hereto as Exhibit 35 and  incorporated herein by reference, at ¶ 17; Exhibit 11.  **DENIED** incorporate response to #13above and assume constructive knowledge of CPD as described above

23.   Chief Burton informed Mr. Akins that he was having someone look into the issue and assigned the matter to Captain Jill Schlude on February 27, 2013. Exhibit 35, at ¶ 18; February 27, 2013 Correspondence between Ken Burton and Matthew Akins, attached hereto as Exhibit 12 and incorporated herein by reference; February 27, 2013 through March 26, 2013, Correspondence between Jill Schlude and Matthew Akins, attached hereto as Exhibit 13 and incorporated herein by reference.  **DENIED** Exhibit #35 does not support this statement

24.   Mr. Akins requested his firearm be returned from the Boone County Prosecutor's

Office on or about March 1, 2013. *See* March 1, 2013 correspondence between Matt Akins and CJ Dykhouse, Boone County Counselor, attached hereto as Exhibit 4 and incorporated herein by reference. **DENIED** Exhibit #4 does not support this statement. It appears to have been written by Boone County Counselor CJ Dykhouse and makes reference to a communication to Dan Knight made on or about February 22, 2013.

25.   Captain Schlude began investigating Mr. Akins' request to have his firearm returned to  him and by March 26, 2013, had learned that Mr. Akins' no longer had a pending felony, obtained permission from the Boone County Prosecuting Office to release the firearm, authorized the return of Mr. Akins' firearm directly to him, indicating "no longer pending felony-no felony convictions-release to Mr. Akins", and notified Mr. Akins that he could pick up the firearm.  Exhibit 13; Exhibit 9; March 20, 2013 Columbia Police Department Evidence Unit Criminal History NCIC/MULES Request for Release of Firearm, attached hereto as Exhibit 14 and incorporated herein by reference.  **DENIED** (See Akins #10 Hamilton affidavit) as noted previously Boone County Prosecutor Roger Johnson in February 2012 authorized the release of Mr. Akins firearm and by law it should have been released after November 16, 2010, when the case was dismissed

26.   On March 28, 2013, Michelle Heater sent Mr. Akins a letter indicating he could personally pick up his .380 Bersa handgun by appointment.  March 28, 2013 Correspondence between Michelle Heater and Matthew Akins, attached hereto as Exhibit 6 and incorporated herein by reference. **ADMITTED**

27.   Mr. Akins did not pick up the firearm until April 15, 2013. April 15, 2013, Columbia Police Department Property Receipt, attached hereto as Exhibit 16 and

incorporated herein by reference; Exhibit 33, at ¶ 12. **ADMITTED**

   **b.  May 19, 2010 Incident**

   28.   On May 19, 2010, Mr. Akins was stopped by Officer Thomas Quintana.  May 17,

2016 Thomas Quintana Affidavit , attached hereto as Exhibit 37 and incorporated

herein by reference, at ¶  3. **ADMITTED** BUT NOT RELEVANT

29.   At this time, Mr. Akins had two active warrants for his arrest. Exhibit 1, at 87:13-15;

Matthew Akins Warrant 1 Executed by Thomas Quintana, attached hereto as Exhibit

44 and incorporated herein by reference; Matthew Akins Warrant 2 Executed by

Thomas Quintana, attached hereto as Exhibit 50 and incorporated herein by

reference.  **ADMITTED** BUT NOT RELEVANT

30.   Officer Quintana testified that Mr. Akins' window tint appeared to be darker than the

legal limit and that the vehicle had expired plates.  Columbia Police Department

Offense Report 2010-005565, attached hereto as Exhibit 22 and incorporated herein

by reference; Exhibit 37, at ¶ 4.  **ADMITTED** BUT NOT RELEVANT

   31.   Officer Quintana observed a flake of marijuana on the driver's seat.  Exhibit 22;

Exhibit 37, at ¶ 11. **DENIED**, but admitted he claimed to have seen a "**flake** of

marihuana"

32.   Mr. Akins does not dispute that it is possible that marijuana was found on his driver's

seat since he was still using marijuana at this time.  Exhibit 1, at 89:17-90:2.

**Objection** not a statement of facts but speculation but if the statement is in

compliance with the rule it is **ADMITTED** BUT NOT RELEVANT

33.   Mr. Akins was arrested pursuant to the two outstanding warrants.  Exhibit 37, at ¶ 10;

Columbia Police Department Arrest Report 2010-005565, attached hereto as Exhibit

45 and incorporated herein by reference. **ADMITTED** BUT NOT RELEVANT

### c. June 6, 2010 Incident

34.  On June 6, 2010, Mr. Akins was stopped and issued a citation by Sergeant Roger

Schlude for an illegal turn.  Exhibit 1 (102:9-25); Roger Schlude Citations Inquiry

Screen from June 19, 2010, attached hereto as Exhibit 15 and incorporated herein by

reference. **ADMITTED**

35.  Mr. Akins had a firearm in the floorboard of his vehicle and told Sergeant Schlude

about the firearm.  Exhibit 1 (103:24-104:16).  **ADMITTED** on the rear floorboard

36.  There were three individuals in Mr. Akins' vehicle, including an individual in the

backseat in the area where Mr. Akins' indicated a firearm was present.  Exhibit 1

(105:5-8; 103:24-104:3). **ADMITTED**

37.  Mr. Akins claims that Sergeant Schlude thought he saw ammunition in Mr. Akins'

vehicle. Exhibit 1 (103:18-24). **ADMITTED** THAT SGT. ROGER SCHLUDE

THOUGHT THE CONDOMS IN HIS GLOVE COMPARTMENT WAS

AMMUNITION WHEN HE OBSERVED THEM

38.  At the time of this stop, Mr. Akins had already been charged with a felony weapons

violation.  Exhibit 10.  **OBJECTION**, NOT RELEVANT AND NOT A

STATEMENT OF FACTS WITHIN THE RULE but **ADMITTED** If permitted over

OBJECTION

### d. July 27, 2011 Incident

39.  On July 27, 2011, Officer Rob Sanders was on duty and travelling North on

Providence Street in Columbia, Missouri.  May 17, 2016 Rob Sanders Affidavit,

attached hereto as Exhibit   36 and incorporated herein by reference, at ¶ 3.

**DENIED,** Rob Sanders' statement to internal affairs stated he was eastbound on Worley, and only turned North on Providence after noticing the vehicle Akins was in. (Page CONFIDENTIAL001328 of Plaintiff SJ Exhibit #25 CONFIDENTIAL Rob Sanders IA Taco Bell)

40. As he was travelling, Officer Sanders observed the vehicle in front of him behave differently and in an unusual manner, according to Officer Sanders' training and experience, once the driver of the vehicle noticed his patrol car. Exhibit 36, at ¶ 4, 8.

     **DENIED,** Rob Sanders' statement to Internal Affairs stated he made these observations as he sat beside the vehicle at the intersection of Providence and Worley, waiting to continue eastbound on Worley. He further stated the only reason he turned and began heading northbound was because he noticed the behavior he categorized as unusual. His recent affidavit now say he had been heading northbound on Providence when he noticed these behaviors from the occupants of the vehicle traveling in front of him. (Page CONFIDENTIAL001329 of **Plaintiff SJ Exhibit #25** CONFIDENTIAL Rob Sanders IA Taco Bell and City Exhibit 82-30 Sanders) *Internal Affair stated in their report, "Officer Hedrick later confirmed as best he could recall it was his understanding Officer Sanders had become suspicious of the subjects as they were on a previous call he (Officer Sanders) was on. (Page CONFIDENTIAL001311 of Plaintiff SJ Exhibit #25 CONFIDENTIAL Rob Sanders IA Taco Bell) *Akins and Carter had been filming police officers as part of Citizens For Justice prior to the interaction with Sanders. (City Exhibit 1, at 121: 9-13)

41. The vehicle had just come out of a high crime area. Exhibit 36, at ¶ 6. **DENIED**, SPECULATION unsupported by anything other that Officer Sanders self-serving

opinion

42.    The occupants of the vehicle began talking and gesturing animatedly. Exhibit 36, at ¶

5. **ADMITTED** as Akins and Carter were retrieving the camera to document the

encounter. Officer Sanders originally claimed in his statement to Internal Affairs that

he noticed Akins and Carter talking and gesturing while the cars were sitting in the

eastbound lane at the intersection of Worley and Providence, contrary to his new

affidavit claiming that this occurred as he following the car northbound on

Providence. (Page CONFIDENTIAL001329 of Plaintiff SJ Exhibit #25

CONFIDENTIAL Rob Sanders IA Taco Bell and City Exhibit 82-30 Sanders)

43.    The driver of the vehicle began exhibiting what Officer Sanders interpreted as

avoidance techniques, including changing lanes multiple times and turning into a

parking lot.  Exhibit 36, at ¶ 7; Exhibit 1, at 133:1-3.  **Objection s**peculation not a

statement of fact and not supported by City's Exhibit 36 therefore **DENIED**

44.    Officer Sanders interpreted this behavior as consistent with someone trying to avoid

contact with the police.  Exhibit 36, at ¶ 8.  **Objection s**peculation not a statement of

fact and not supported by City's Exhibit 36 therefore **DENIED**

45.    A month prior to the encounter with Mr. Akins, Officer Sanders had stopped a car

during a robbery investigation and had ended up arresting the suspects for robbery.

Exhibit 36, at ¶ 28.  OBJECTION, NOT RELEVANT AND NOT SUPPORTED BY

EXHIBIT #36 AND THEREFORE DENIED

46.    Officer Sanders noticed the driver of the vehicle exhibit similar reactions as the

robbery suspects.  Exhibit 36, at ¶ 29.  **OBJECTION**, NOT RELEVANT AND NOT

SUPPORTED BY EXHIBIT #36 AND THEREFORE **DENIED** (SEE ALSO AKINS

EXHIBIT #25 Rob Sanders IA investigation, Internal Affairs further stated in their report, "Officer Sanders noted in that situation, the occupants' reaction to seeing the police cars was similar to what he had observed by these subjects. There appears to be a significant distinction, however, between this incident and the prior incident to which Officer Sanders referred." (Page CONFIDENTIAL001316 of Plaintiff SJ Exhibit #25 CONFIDENTIAL Rob Sanders IA Taco Bell)

47.    Officer Sanders radioed into dispatch, informed dispatch he was going to attempt a "check subject", and requested one police officer for backup Exhibit 36, at ¶ 9; July 27, 2011 Communication between Officer Sanders and CPD Dispatch, attached hereto as Exhibit 20 and incorporated herein by reference, at :58-1:13.  **DENIED**, Fact misstates contents of Akins Ex 25 Sanders Taco Bell IA report: Sanders initially ran the license plate of the vehicle through joint communications. Nothing was reported that would have arose suspicion. Sanders did not inform dispatch that he was going to attempt a "check subject," rather that he was going to "check on this vehicle," referring to the vehicle Akins was driving. (Communication between Officer Sanders and CPD Dispatch marked incorrectly as City Exhibit 20) Based on Sanders' statements, Joint Communications originally recorded the incident as a "T-Traffic Stop" (Page CONFIDENTIAL001317 of Plaintiff SJ Exhibit #25 CONFIDENTIAL Rob Sanders IA Taco Bell). Internal Affairs stated "It appears as a result of the initial radio traffic in which Officer Sanders ran the registration of the vehicle and checked for priors and then advised Joint Communications he was going to try to check on the vehicle, they entered the call as a "Traffic Stop" rather than a "Check Subject" or "Suspicious Vehicle."" (Page CONFIDENTIAL001308 of

Plaintiff SJ Exhibit #25 CONFIDENTIAL Rob Sanders IA Taco Bell) Upon

responding to Sanders' request for additional officers, Officer Hedrick advised Joint

Communications they could show Officer Parsons and him "Arrival" on Officer

Sanders' "stop." (Page CONFIDENTIAL001307 of Plaintiff SJ Exhibit #25

CONFIDENTIAL Rob Sanders IA Taco Bell)

48.   A "check subject" is not an investigative stop and instead is an attempted

consensual encounter where the Officer attempts to check the subject's identification.

Exhibit 36, at ¶ 11. O**BJECTION**, speculation not within the meaning of the rule  and

not relevant and therefore **Denied**

49.   Officer Sanders did not request a K-9 unit.  Exhibit 36, at ¶ 10; Exhibit 20, at :58-

1:13. **ADMITTED**, but his request for assistance was responded to by a K-9 Unit

50.   Officers Hedrick and Parsons, who were operating as a two-person unit while

Officer Hedrick was training Officer Parsons and a new K-9, responded to Officer

Sanders' request for backup. May 16, 2016 Scott Hedrick Affidavit, attached hereto as

Exhibit 31 and incorporated herein by reference, at ¶¶ 2-3.  **ADMITTEED**

51.    Officer Sanders followed the vehicle into the parking lot. Exhibit 36, at ¶ 12.

     **ADMITTED**

52.   A portion of the encounter between Mr. Akins and Officer Sanders was recorded by

Mr. Akins.  See Part 1 of 3 of July 27, 2011 encounter between Mr. Akins and Officer

Sanders, attached hereto as Exhibit 17 and incorporated herein by reference, Part 2 of 3

of July 27, 2011 encounter between Mr. Akins and Officer Sanders, attached hereto as

Exhibit 18 and incorporated herein by reference, and Part 3 of 3 of July 27, 2011

encounter between Mr. Akins and Officer Sanders, attached hereto as Exhibit 19 and

incorporated herein by reference. **ADMITTED**

53.   Mr. Akins drove through the drive-through of a Taco Bell and ordered a burrito. Exhibit 17, at :57-1:04. **ADMITTED**

54.   Officer Sanders saw a light shine at him and had recently been trained that individuals will use phones or cameras to video police to try to deter contact by the officers. Exhibit 36, at ¶¶ 14-15. **ADMITTED** goes to show Columbia Police were trained to target citizens with cameras as engaging in misconduct

55.   Officer Sanders initially followed Mr. Akins into the drive-through lane before exiting the drive-through lane and parking in the parking lot. Exhibit 17, at 1:20-2:15. **ADMITTED**

56.   Mr. Akins, after receiving his burrito, also parked in the parking lot. Exhibit 17, at 2:20-2:30. **ADMITTED**

57.   Officer Sanders observed the vehicle park in the parking lot and begin to watch his patrol car. Exhibit 36, at ¶ 17. **ADMITTED**

58.   After Mr. Akins had parked his vehicle, Officer Sanders approached the vehicle. Exhibit 17, at 2:25-2: 35. **ADMITTED**

59.   Officer Sander's dash cam video captured a portion of his interactions with Mr. Akins. Rob Sanders' July 27, 2011 Dash Cam Video, attached hereto as Exhibit 48 and incorporated herein by reference. **ADMITTED**

60.   Neither Officer Sanders' patrol car nor Officer Parson's patrol car was parked in a way that would have prevented Mr. Akins from leaving the parking lot. Exhibit 36, at ¶¶ 18-19; Exhibit 31, at ¶¶ 11-12. **DENIED,** (See Akins exhibit # 1, part 1 and City Ex 17 which showed out Akins driver's side door looking down the side of the

vehicle that Officer's Parson's Patrol vehicle is parked completely blocking the rear of Akins' vehicle. (See Also, Akins # 25) Internal Affairs investigation stated "It appears after parking his patrol car behind Akins' vehicle, Officer Sanders exited his vehicle and approached the driver's side window (nearest Akins) (Page CONFIDENTIAL001307 of Plaintiff SJ Exhibit #25 CONFIDENTIAL Rob Sanders IA Taco Bell)

61.  Officer Sanders' dash cam video shows the position of Mr. Akins's vehicle and Officer Sanders' patrol car.  Exhibit 36, at ¶ 22; Screen Shot of Officer Sanders' Dash Cam video at 23:22:42 on July 27, 2011, attached hereto as Exhibit 21 and incorporated herein by reference. **ADMITTED**

62.  Mr. Akins testified that he did not know if he was able to back out and did not try to back out because he did not believe that would "be a wise decision."  Exhibit 1, at 167:18-168:12.  **ADMITTED** (SEE AKINS DEPOSITION CITY Ex #1) The listed section of Akins' deposition also has Akins stating he didn't try to back out because he felt as though he was detained stating "It didn't feel like I was free to go"

63.  Officer Sanders asked the occupants of Mr. Akins' vehicle if he could see their drivers' license.  Exhibit 17, at 2:35-2:40.  **ADMITTED** that while Officers Hedrick, Parson and a K-9 Officer were surrounding Akins vehicle Officer Sanders made this demand,

64.  Officer Sanders told Mr. Akins that he was not conducting a traffic stop.  Exhibit 17, at 2:45-2:50.  **ADMITTED** see response to #63 above and incorporate here

65.  Mr. Akins asked, "So you're just asking [for] identification?"  Exhibit 17, at 2:47-2:50. **ADMITTED** see response to #63 above and incorporate here

66.    Officer Sanders responded, "Yeah." Exhibit 17, at 2:47-2:50. **ADMITTED** see

response to #63 above and incorporate here

67.    Both occupants of Mr. Akins' vehicle consented to giving Officer Sanders their

drivers' licenses.  Exhibit 17, at 2:45-2:55; Exhibit 1, at 148:6-14. **DENIED** (See

Akins Ex#2 his affidavit) in which Akins responds to Officer Sanders request for his

license by asking what his "probable cause" was to make the request and Officer

Sanders in an commanding tone stated, "I don't have to have probable cause !" (See

also Akins supplemental affidavit attached hereto as Ex. #44 and Akins #25 Sanders

Taco Bell IA report) Akins felt they were responding to a lawful order as opposed to

a casual request. Carter was resistant towards handing his ID over so Akins

encouraged him to do so, believed they were required to based on the situation they

were in. (Akins Affidavit # 2 & #44) Internal Affairs stated, "Taking all facts into

consideration, it appears this was a "detention" as opposed to a "consensual contact."

(Page CONFIDENTIAL001315 of Plaintiff SJ Exhibit #25 CONFIDENTIAL Rob

Sanders IA Taco Bell)

68.   Officer Sanders then leaves to check the occupants' drivers' licenses, saying,

"Alright.  Sit tight guys. I will be right back with you, okay?"  Exhibit 17, at 3:13-3:17.

**ADMITTED**

69.   Both occupants agreed.  Exhibit 17, at 3:13-3:17. **DENIED** see response #67 above

70.    Officer Sanders did not know Mr. Akins was the driver of the vehicle until after he

asked for Mr. Akins' identification.  Exhibit 36, at ¶ 25. **DENIED** Akins had

previously filmed Sanders using the same vehicle they were driving that night.

(11:17 of Plaintiff SJ Exhibit #4 How to Handle a Questionable Encounter With the

Columbia Police Department & Akins Supplementary Affidavit Ex #44 attached hereto)

71. Mr. Akins was driving his mother's car. Exhibit 1, at 155:14-16. **ADMITTED**

72. Officer Hedrick approached the vehicle and asks Mr. Akins questions about Mr. Akins' camera for his own personal knowledge. Exhibit 17, at 4:25-4:29.

 **ADMITTED**

73. Officer Hedrick told Mr. Akins that Officer Sanders was "just checking you," that he and Officer Parsons "happened to be in the area" and it was "just safety issues." Exhibit 17, at 3:48-4:00. **ADMITTED**

74. Officer Sanders returned to Mr. Akins' vehicle, gave the occupants their drivers' licenses back, and thanked them for their cooperation. Exhibit 18, at :04-:08.

 **ADMITTED**

75. According to Mr. Akins, Officer Sanders' check took no longer than one minute and thirty seconds. Exhibit 17, at 3:15-4:30; Exhibit 18, at :00-:05; Exhibit 1, at 159:4-12. **DENIED** none of the referenced exihibits support this assertion

76. Officer Sanders noticed an open beer bottle in Mr. Akins' vehicle. Exhibit 18, at :14-:16. **ADMITTED**

77. Mr. Akins told Officer Sanders the open beer bottle in the car was his mother's. Exhibit 18, at :20-:27. **ADMITTED**

78. Officer Sanders volunteered to throw the bottle away for Mr. Akins. Exhibit 18, at 27-:36. **ADMITTED**

79. At no point during the encounter did Officer Sanders activate his lights or sirens. Exhibit 36, at ¶ 26; Exhibit 1, at 134:25-135:2. **ADMITTED**

80. At no point during the encounter did Officer Sanders or Officer Hedrick draw their firearms. Exhibit 1, at 156:12-17; Exhibit 36, at ¶ 27. **ADMITTED**

81. Officer Sanders did nothing to harass or threaten Mr. Akins. See Exhibit 17, 18, and 19. **DENIED** (See Akins' Ex #2) Akins felt like the stop in itself was targeting and that Sanders had done so to harass and intimidate them into not filming officers anymore. (14:12 of Plaintiff SJ Exhibit **#4** How to Handle a Questionable Encounter With the Columbia Police Department & Akins Supplementary Affidavit Ex #44 attached hereto) Chief Burton told the Columbia Daily Tribune "In my mind, he knew who they were and was going to play a little 'turnabout is fair play'." (Tribune article about Sanders, see EX# 47 attached hereto)

82. Officer Sanders did not mention Citizens for Justice during the stop and declined to investigate the open container of beer in Mr. Akins' vehicle. Exhibits 17, 18, and 19. **DENIED**, Sanders did not use the words "Citizens For Justice" during the stop, but asked Joint Communications if they were capable of adding to the registration in the ticket that the subjects were "Columbia Citizens on Patrol" (Page CONFIDENTIAL001308 of Plaintiff SJ Exhibit #25 CONFIDENTIAL Rob Sanders IA Taco Bell & Communication between Officer Sanders and CPD Dispatch) Empty Beer Bottle did not fit the description of open container. Not an offense under either Mo law or City of Columbia ordinance to have an empty beer bottle in the car.

83. Mr. Akins did not leave the parking lot until after Officer Sanders had left. Exhibit 19. **ADMITTED**

84. After Officer Sanders left the parking lot, Mr. Akins continued to stay and eat his burrito. Exhibit 19. **ADMITTED**

### e. October 14, 2011 Incident

85.   On October 14, 2011, Mr. Akins was in a bar in Columbia, Missouri, after the bar

   had closed.  Exhibit 1, 174:7-8; Exhibit 29, at ¶¶ 25-26, 29. ADMITTED, but  Akins

   was employed at the bar and therefore was allowed to be in the bar past closing. Mr.

   Akins was not in the bar past 1:30 am as the bar closed around 1:00 am to ensure

   patrons had left prior to the 1:30 am deadline. Akins was ordered to leave prior to

   this occurring. (Akins Affidavit Ex 2 & Supplementary Affidavit Ex.#44)

86.   Officer Hughes was patrolling downtown Columbia, Missouri, as part of his duties

   as the Sergeant of the downtown unit.  Exhibit 29, at ¶ 25. **ADMITTED**

87.   Downtown Columbia, Missouri, is a high crime area from sundown to sunup.

   Exhibit 29,  at ¶ 33. OBJECTION, not a statement of fact but unsupported speculation

   and therefore **DENIED**.

88.   Officer Hughes used his patrol car spotlight to illuminate the interior of Salty's bar

   and observed that people were still present in the bar.  Exhibit 29, at ¶ 26. **ADMITTED**

89.   The use of spot lights was a standard procedure for the Columbia Police

   Department downtown unit in 2011.  Exhibit 29, at ¶ 30. **ADMITTED**

90.   The Columbia Police Department had adopted the procedure from the Lincoln

   Nebraska Police Department.  Exhibit 29, at ¶ 31. **ADMITTED**

91.   The purpose of the procedure was to encourage patrons to leave bars at closing time

   and avoid loitering in the front of bars.  Exhibit 29, at ¶ 32. **ADMITTED**

92.   The Columbia Police Department had found that individuals loitering in front of bars

   after closing time often resulted in fights and other peace disturbances.  Exhibit 29,

   at ¶ 32. **ADMITTED**

93. Further, the downtown unit would use spot lights in 2011 to identify individuals and gain visibility at night, as there were often intoxicated individuals walking the streets. Exhibit 29, at ¶ 34. **ADMITTED**

94. Numerous individuals can be seen leaving Salty's bar after the 1:30 a.m. closing time. *See* Matthew Akins' Recording of encounter at Salty's Bar, attached hereto as Exhibit 34 and incorporated herein by reference, at 2:00-2:09. **ADMITTED**

95. Officer Hughes spoke with an employee of Salty's about the individuals in the bar passed 1:30 a.m. Exhibit 29, at ¶ 28. **ADMITTED**

96. Mr. Akins recorded the encounter and is even heard saying, "I think cops just showed up just to disperse everybody." Exhibit 34, at 2:11-2:15. **DENIED**, NOT SUPPORTED BY REFERENCED EXHIBIT

97. Mr. Akins approached Officer Hughes outside the bar. Exhibit 29, at ¶ 29; Exhibit 1, at 176:1-7. **ADMITTED** after Officer Hughes had instructed the manager to leave the establishment (See City's Ex 1 175:10-176:7)

98. At this time, Mr. Akins had at least one warrant, Warrant 6M-10-02857-MT, out for his arrest. Matthew Akins Warrant Executed by Eric Hughes, attached hereto as Exhibit 32 and incorporated herein by reference; Exhibit 29, at ¶ 29; Columbia Police Department Offense Report 2011-012225, attached hereto as Exhibit 42 and incorporated herein by reference. **ADMITTED**

99. Officer Hughes arrested Mr. Akins pursuant to the warrant. Exhibit 29, at ¶ 29; Exhibit 1, at 177:10-14, Matthew Akins' Video of Erich Hughes Salty's Arrest, attached hereto as Exhibit 47 and incorporated herein by reference. **ADMITTED**

100. While being arrested, Mr. Akins asked Officer Hughes about a poster hung in the

Columbia Police Department.  Exhibit 1, at 176:10-16; Exhibit 29, at ¶ 35.

**ADMITTED**

101. Officer Hughes told Mr. Akins he thought the poster was hung because Mr. Akins

had a warrant out for his arrest.  Exhibit 1, at 176:10-16; Exhibit 29, at ¶ 35.

**ADMITTED**

### f.  October 16, 2011 Incident

102. On October 16, 2011, Mr. Akins was leaving Salty's bar around closing time.

Exhibit 1, at 186:3-15. **ADMITTED**

103. Mr. Akins alleges he was spotlighted by a Columbia Police Officer.  Exhibit 1, at

187:12- 14; Matthew Akins' October 16, 2011 Salty's Video, attached hereto as Exhibit

49 and incorporated herein by reference. **ADMITTED**

104. The alleged officer who allegedly spotlighted Mr. Akins was Officer Corcoran.

Exhibit 1, at 190:7-11. **ADMITTED**

105. Mr. Akins was in a high crime area and in a crowd that had exited a bar.  Exhibit 1,

193:2-7; Exhibit 29, at ¶ 33. **DENIED**,  Defendant Hughes claimed Downtown

Columbia, Missouri is a high crime area from sundown to sunup. No crime statistics

have been produced backing this claim. No standard, departmental or otherwise, has

been produced for what constitutes a "high crime area" as opposed to a low or

medium crime area. The spotlight singled Akins out of the crowd and followed him

as he walked perpendicular to the crowd. (Akins Supplementary Affidavit EX #44 ,

(6:48 BCSD vs. CPD video  Akins EX #34)

### g.  September 11, 2012 Incident

106. On September 11, 2012, Officer Palmer stopped Mr. Akins after Mr. Akins failed to

yield the right of way to Officer Palmer and almost struck Officer Palmer's patrol

car.  September 11, 2012 Probable Cause Statement, attached hereto as Exhibit 23

and incorporated herein by  reference; May 17, 2016 Palmer Affidavit, attached

hereto as Exhibit 38 and incorporated herein     by reference, at ¶ 4; Exhibit 1, at

198:15-25. **DENIED**,  Akins vehicle was not close to hitting Palmer's vehicle, as

reflected in Palmer's dash cam video. Akins stated during his deposition, "I begin to

pull forward from the stop sign, wasn't paying a lot of attention, and I -- but I quickly

noticed -- I probably wasn't a foot or two into the intersection and noticed that there

was a Columbia police officer at the other intersection -- at the other side of the

intersection to my right." He further stated "I had stopped and say, you know, put my

hand up to say, you know, my fault, my apologies, or he just waved me on." (Palmer

Dashcam City Ex 46, City Exhibit 1 198:17-25, Akins Affidavit Akins Ex 2, Akins

Supplementary Affidavit Akins Ex. #44)

107.   The encounter with Mr. Akins was recorded by Officer Palmer's dash cam video.

Michael Palmer September 11, 2012 Dash Cam Video, attached hereto as

Exhibit 46 and  incorporated herein by reference. **ADMITTED**

108. Officer Palmer did not know Mr. Akins was the driver of the vehicle that did not

yield in the intersection until after Officer Palmer stopped him.   Exhibit 38, at ¶ 5.

**ADMITTED**

109. Mr. Akins was driving a white Kia Optima.  Exhibit 38, at ¶ 4. **ADMITTED**

110. Mr. Akins could not produce a drivers' license and instead stated he had a hardship

license.  Exhibit 23, Exhibit 38, at ¶ 7; Exhibit 1, at 199:1-13.  **ADMITTED**

111. Officer Palmer checked Mr. Akins' information through the MULES system, and

found out that Mr. Akins' license had been revoked and there were no limited driving privileges. Exhibit 23, Exhibit 38, at ¶ 9; Exhibit 1, at 199:1-13. **ADMITTED**

112. Mr. Akins was unable to provide proof of insurance. Exhibit 23; Exhibit 38, at ¶

10.        **ADMITTED**

113. At this point, Mr. Akins was arrested for driving without a license. Exhibit 23, Exhibit 38, at ¶ 11; Exhibit 1, at 199:10-13, 200:17-22. **ADMITTED**

114. Officer Palmer conducted a search of Mr. Akins following Mr. Akins' arrest. Exhibit 23; Exhibit 38, at ¶ 12; Exhibit 1, at 201:5-7. **ADMITTED**

115. During the search, a butterfly knife was found in Mr. Akins' right-front pants pocket. Exhibit 23; Exhibit 38, at ¶ 12; Exhibit 1, at 203:17-21. **ADMITTED**

116.    Officer Palmer believed this knife was a prohibited weapon due to being able to open the knife by gravity or the application of centrifugal force. Exhibit 23; Columbia Police Department Offense Report 2012-010603, attached hereto as Exhibit 24 and incorporated herein by reference; Exhibit 38, at ¶ 13. DENIED, speculation based upon inadequate training. Akins' knife had a locking latch that prevented it from opening by centrifugal force until after the latch was disengaged. Akins' knife did not violate federal law or Missouri law. Palmer admitted he is "not familiar with federal knife law (Akins Ex 29, Palmer Admission #5) Akins informed Palmer during the arrest that he believed the knife was legal. (Akins Ex 28, Palmer Interrogatory #17) Palmer checked with his supervisor, Defendant Schlude, who instructed him the knife was illegal. (Akins Ex. 28, Palmer Interrogatory #16)

117.    Mr. Akins testified that he did not know if the butterfly knife could be opened by centrifugal force. Exhibit 1, at 202:9-24. DENIED, The words centrifugal force are

never used in the cited section and Akins stated he didn't how a person would open that knife with one hand, being that it had a latch to secure it shut. (Same citation as fact) The safety latch prevents an individual from using centrifugal force to open the knife without first unlatching it. (Akins Supplementary Affidavit Ex #44 attached hereto)

118. The butterfly knife had a blade that would fold into its handle. Photograph of Matthew Akins' Butterfly Knife, attached hereto as Exhibit 25 and incorporated herein by reference; Exhibit 1, at 202:9-13. ADMITTED almost all pocket knifes have a blade that folds into the handle (Akins Supplementary Affidavit Ex #44 attached hereto)

119. Mr. Akins' butterfly knife, if measured from the beginning of the metal making up the blade (which begins near the two circle hinges), measures in excess of four inches. See      Exhibit 25. **DENIED** (SEE AKINS EX. #7 CPD pictures of the knife blade by ruler and Akins Supplementary Affidavit Ex #44 attached hereto)

120. It appears that the "edge" of the knife is less than four inches. Exhibit 25.

**ADMITTED**

121. Mr. Akins was transported to the Columbia Police Department for processing, ticketed for failure to yield after stopping to a vehicle that entered an intersection and failure to maintain financial responsibility, and arrested for unlawful use of a weapon, possession of a prohibited weapon, and driving while revoked. Exhibit 23; Exhibit 38, at ¶¶ 14-16. **ADMITTED**

122. Officer Palmer submitted a probable cause statement related to the September 11, 2012,   encounter. Exhibit 23. **ADMITTED**

123. The only fact in the probable cause statement regarding the butterfly knife is that the knife was "designed to be opened from the handle by gravity or by the application of centrifugal force." Exhibit 23. **ADMITTED**

124. Officer Palmer checked whether the butterfly knife was a legal knife with his supervisor, who told him the knife was illegal prior to submitting the probable cause statement. Exhibit 38, at ¶ 17. **ADMITTED**, demonstrating the lack of department training on legal knifes

125. Section 571.020 RSMo changed from the 2011 version to the 2012 version on August 28, 2012. *See 2012 H.B. 1647*, § A. **ADMITTED**

126. Mr. Akins pleaded guilty to driving while revoked/suspended and failure to yield the right of way. Judgment in Boone County Case No. 12BA-CR03890, attached hereto as Exhibit 40 and incorporated herein by reference. **ADMITTED**

### h. Poster of Matthew Akins

127. Prior to the creation of his website, Mr. Akins had at least 9 contacts with the Columbia Police Department that resulted in Mr. Akins' arrest. MULES Report for Matthew Akins, attached hereto as Exhibit 41 and incorporated herein by reference. **ADMITTED**

128. At some point in 2011, a single poster of Mr. Akins was displayed in the briefing room at the Columbia Police Department. Exhibit 35, at ¶ 7; Poster of Matthew Akins, attached hereto as Exhibit 26 and incorporated herein by reference. DENIED, (Akins Supplementary Affidavit Ex #44 attached hereto)

129. The creator of the poster is unknown. Exhibit 35, at ¶ 7; Correspondence from Jill Schlude to Matthew Akins regarding replies to Mike Martin's questions, attached

hereto as    Exhibit 43 and incorporated herein by reference. **OBJECTION**, speculation these posters were posted in a secured area of CPD restricted to authorized or escorted persons and therefore **DENIED**  (See City Ex 1 and Akins Supplementary Affidavit Ex #44 attached hereto)

130. The poster contains a photograph of Mr. Akins and states Mr. Akins was driving a silver    Grand Prix Pontiac MO DD9H1T. Exhibit 26. **ADMITTED**

131. Mr. Akins was approaching officers at night with a camera that had a small red light while Columbia Police Offices were in potentially dangerous situations.  Exhibit 1, at 279:10-17, 315:13-25, 143:19-25, 190:13, 121:9-22, 155:7-12, 191:17-19, 278:7-23. *See also, e.g.*, Exhibit 1, at 291:14-295:6.  **OBJECTION** speculation, neither City Ex 1 or Exhibit 26 the poster mentioned anything about Akins filming or approaching officers as described herein, just that Akins, "Has    arrests in our system for weapons violation, including carrying a pistol concealed on his person" therefore **DENIED**

132. Chief Burton testified that the purpose of the poster was for the safety of both Mr. Akins and the Columbia Police Officers, as Mr. Akins was approaching the Officers at night while they were responding to calls.  Exhibit 35, at ¶ 7.  **OBJECTION** speculation since the creator was "anonymous" and Chief Burton's declaration is self-serving and without a basis in fact and   therefore **DENIED**

133. Captain Jill Schlude testified (and told Mr. Akins) that the purpose of the poster was twofold: 1) for the safety of Mr. Akins and 2) because Mr. Akins had an active warrant for his  arrest.  Exhibit 26; Deposition of Jill Schlude, attached hereto as Exhibit 27 and incorporated herein by reference, at 24:9-14; Exhibit 43.

**OBJECTION** speculation since the creator was "anonymous" and Captain Schlude's declaration is self-serving and without a basis in fact in that poster makes no mention of any warrants and therefore **DENIED**

134. Mr. Akins was specifically informed that the Columbia Police Department did not have a policy, procedure or directive regarding posters being displayed within the department. October 18, 2012 Correspondence between Ken Burton and Matthew Akins, attached hereto as Exhibit 30 and incorporated herein by reference.
   **ADMITTED**

135. Mr. Akins' Complaint alleges he received "unwanted police attention in retaliation for his exercise of his First Amendment rights and placed him at greater risk of police misconduct." Plaintiff's Complaint, at ¶ 28; see also, Plaintiff's Complaint, at ¶ 84.
   **ADMITTED**

136. Mr. Akins' alleges that he went public with a website and multi-media platform called "Citizens for Justice" in April of 2011, which reported law enforcement interactions with the public and focuses on alleged police misconduct by the Columbia Police Department. Plaintiff's Complaint, at ¶ 29. **ADMITTED**

137. Mr. Akins alleges this website started construction in June of 2010, and that the Columbia Police Department became aware of the website in December of 2010. Complaint, at ¶ 29. **ADMITTED**

138. On December 27, 2010, Eric Dearmont, director of the Columbia Police Officer's Association and an attorney, contacted Mr. Akins' web administrator and relayed the following: "While we do not have conceptual concerns about the website itself, we

have been        informed that the site may contain the personal contact information (address, etc.) of our            officers.  Please be advised that this presents a safety risk to officers and their families.  We a        ask that in developing this site you omit all personal information.  Thank you for your                    consideration." December 27, 2010 Email from Eric Dearmont regarding Mr. Akins' website,        attached hereto as Exhibit 39 and incorporated herein by reference. **ADMITTED**

139. Both the 2010 incident with Officer Hughes and the 2010 incident with Officer Schlude        occurred prior to Mr. Akins beginning his website.  Exhibit 1, at 250:4-11. **DENIED,** AKINS        HAD BEGUN HIS WEBSITE PRIOR TO THE INCIDENT WITH OFFICER SCHLUDE            (SEE Akins Ex # 2 & Ex 44) Akins had paid Arch Brooks consulting fee to assist in the            development of the Citizens For Justice website at the time of this stop.

140. Mr. Akins continued his reporting activity for months following the encounter with Officer Palmer on September 11, 2012. Exhibit 1, at 427:4-9.  **ADMITTED**

141. Mr. Akins only discontinued his activities with Citizens for Justice when his website was accidentally erased by his own website administrator.  Exhibit 1, at 261:17-262:2.  DENIED,  Cited section states nothing about Akins discontinuing his work with Citizens For Justice, only that the website was erased. Citizens For Justice still has active Youtube and Facebook pages. (Cited section in City Ex. 1 and Akins Sup. Affidavit Ex #44)

142. No Columbia Police Officer referenced Citizens for Justice or talked about Mr. Akins filming police officers for Citizens for Justice during any encounter with Mr. Akins.

Exhibit 1, at 208:3-8. **DENIED**, Fact misstates cited evidence. Akins was asked if Officers had referenced Citizens For Justice or filming officers during interactions in which he was the subject, as in the arrestee or detainee. Multiple officers have spoken to Akins about CFJ and his filming activities when he approached/communicated with them in his capacity as a reporter for Citizens For Justice, including offering criticisms related to the activities and Rob Sanders attempting to place our affiliation in the computer system notes. These officers include Sanders, Kim German, Mark Brotemarkle, Jeff Forck, Jill Schlude, and Chief Ken Burton.  (Page CONFIDENTIAL001308 of Plaintiff SJ Exhibit #25 CONFIDENTIAL Rob Sanders IA Taco Bell & Communication between Officer Sanders and CPD Dispatch, Kim German Footage, Mark Brotemarkle video, Plantiff SJ Exhibit #16 This is how officers SHOULD react to you video taping them, Jill Schlude Interview, Chief Burton emails) In addition, Palmer admitted to telling his assisting officer of Akins affiliation to CFJ, stating "I informed Officer Kaneaster that Mr. Akins was with Citizens For Justice." Akins had not reviewed these answers to interrogatories at the time of his deposition, as they had not yet been produced. (Palmer Interrogatory response #4) Also, during the Taco Bell stop initiated by Defendant Sanders asked Joint Communications if they were capable of adding to the registration in the ticket that the subjects were "Columbia Citizens on Patrol" (Page CONFIDENTIAL001308 of Plaintiff SJ Exhibit #25 CONFIDENTIAL Rob Sanders IA Taco Bell & Communication between Officer Sanders and CPD Dispatch) Akins was unaware of this at the time of his deposition as these records had not been turned over to the plantiffs at this time.

143. On December 6, 2011, Mr. Akins and Chief Burton communicated about a meeting via email. During this exchange Mr. Akin stated: "Although I was skeptical when you first became Chief and at certain times during your tenure, I have come to respect you and, after living through the Randy Boehm Administration, know it could be a lot worse. All in all, I appreciate what your [sic] doing and wanted to tell you to keep it up." December 6, 2011 Email exchange between Matthew Akins and Ken Burton, attached hereto as Exhibit 28 and incorporated herein by reference. **ADMITTED**

## AKINS SUPPLEMENTAL STATEMENT OF UNDISPUTED FACTS

144. During the summer of 2011, when Matt Akins was filming the Marlon Jordan a local activist who protests against racism to include institutional racism in law enforcement and the judiciary, to pick up a complaint form from the CPD Public Lobby and a CPD employee ordered Akins to cease filming (See Ex. 34 "Not allowed to film in public lobby")

145. At the time of this incident and presently this lobby contains a public memorial to slain CPD Officer Molly Bowden, where citizens frequently gather to honor her memory and observe the display. (See Ex. 34 "Not allowed to film in public lobby" and Akins Ex. #44)

146 At the time of this incident and presently this lobby contains this public lobby contains a "MEDIA BOOK" used by the Columbia Police to communicate to the media and the public 24 hour arrest reports. (See Akins Ex.# 44 & Ex# 48)

147. At the time of this incident and presently this lobby contains CPD beat map by which CPD communicates patrol areas to the public by this display of information. (See Akins Ex.# 44 & Ex# 49)

148.     At the time of this incident  and presently this lobby contains informational

brochures and   other informative pamphlets distributed by the Columbia Police

Department to the public (See    Akins Ex.# 44)

149.     On September 11, 2012, Columbia Police Officer Palmer seized a butterfly-style

pocket  knife and alleged in a probable cause statement it was unlawfully concealed and

unlawful to possess. Those charges were dismissed in March 2013. (See Akins Ex. #44 &

Ex.# 45 CPD Knife        documents)

150.     This butterfly-style pocket knife was returned to Akins and disclosed by the City's

attorney Brad Letterman that it was destroyed by the Columbia Police Department without

notification to Akins and/or judicial authorization as required under Missouri law while in

the  Columbia Police Department's safekeeping. (See Akins Ex. #44 & Ex.# 45 CPD Knife

documents)

151.     On September 07, 2013,  Matt Akins accompanied Samantha Crockett and her

grandmother Sondra Mooney to retrieve custody of her two children from CJ Powell. After

the  custodial Mr Powell assaulted Matt Akins and attempted to forcibly retake custody of

one child he      has in common with Ms. Crockett and her sibling after assaulting Ms.

Crockett. Matt Akins     displayed his Bersa pistol and ordered Mr. Powell to stop his

assault and attempt to kidnap one     child and stop interfering with custody of his one child

in common with Ms. Crockett. After      securing the children in the vehicle and Ms.

Crockett safely in the driver's seat. Mr. Akins had     entered the rear passengers seat when

Mr. Powell prevented this door from closing and re-opened it     and attempted to re-assault

Mr. Akins when Mr. Akins fired a shot between his leg stopping the  assault and causing

Mr. Powell to jump back so that Ms. Crockett could safely drive away. (See  Akins Ex.

#44)

152.     Mr. Powell's neighbor Tyler Hilderman videotaped this entire incident and
established that Mr. Akins had acted in lawful defense of others and lawful self-defense and
he presented this video  to the investigating law enforcement officers on September 07,
2013. (See Akins Ex. # 44 and   Akins Ex.# 55 the Hilderman video) and law enforcement
made a copy.

153.     After the incident Tyler Hilderman, a law enforcement officer asked Mr. Hilderman
to   delete the video and supervised the deletion of said video looking over Mr. Hilderman's
shoulder.    (See Akins Ex. 44)

154.     Columbia Police Officers Vance Pittman, John Dye and Ryan Brunstrom on
September  07, 2013, arrest Matt Akins for this incident, during their arrest they turned off
there recording  devices. (See Akins Ex. 44 and Akins Ex. 53 CPD recording of Akins
September 07, 2013, arrest)

155.     The Columbia City Ordinance authorizing enforcement action by Columbia Police
Officers in effect for small amounts of marihuana in effect on May 09, 2010, stated that
arrests  were not to be made for misdemeanor amounts of Ordinance Section 16-255.2 and
Matt Akins fell  within this ordinance exemption for arrest on May 09, 2010, for
misdemeanor amounts of     Marihuana. (See Akins Ex# 44 and Ex. 51 Columbia
Marihuana Ordinance)


## ARGUMENT IN RESPONSE

The City Defendants in their suggestions in support on page 30 state:

> Mr. Akins may attempt to argue that Officer Hughes had no authority to
> enforce federal law and thus could not rely on a federal violation to

support his probable cause for Mr. Akins' arrest. However, such is not the case. *See Arizona v. United States*, 132 S. Ct. 2492, 2528 (2012) ("It is well established that state and local officers generally have authority to make stops and arrests for violations of federal criminal laws.").

   This is argument is contrary to the central holding of *Arizona v. United States* and the controlling precedent of United States Supreme Court on federalism which notes that it is incontestible that the Constitution established a system of dual sovereignty. The National Government  may not demand that a State use its own governmental system to implement federal commands. (See *United States v Comstock*,  130 S.Ct. 1949, at 1980) Relying on *Printz v. United States*, 521 U.S. 898 (1997) in applying the Constitution to the Brady Handgun Prevention Act, 18 U.S.C. § 922, the Court found unconstitutional a requirement for state law enforcement officers to enforce federal law. The *Printz* Court further found that the Constitution requires "the President, it says, "shall take Care that the Laws be faithfully executed," Art II, §3, personally and through officers whom he appoints . . . The Brady Act effectively transfers this responsibility to thousands of CLEOs in the 50 States, who are left to implement the program without meaningful Presidential control . . . The insistence of the Framers upon unity in the Federal Executive-to insure both vigor and accountability-is well known" *Id.*, at 909  and the *Printz* Court further said, "It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority. See *Texas v. White,* 7 Wall., at 725. **It is no more compatible with this independence and autonomy that their officers be "dragooned" . . . into administering federal law**, than it would be compatible with the independence and autonomy of the United States that its officers be impressed into service for the execution of state laws." *Id.*, at 912 (emphasis added)

The *Printz* Court held, "We held in *New York* that Congress cannot compel the States to enact or enforce a federal regulatory program. Today we hold that Congress cannot circumvent that prohibition by conscripting the State's officers directly. The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program. It matters not whether policymaking is involved, and no case-by-case weighing of the burdens or benefits is necessary; such commands are fundamentally incompatible with our constitutional system of dual sovereignty." *Id*., at 915. In the instant matter Officer Hughes in May 2010, had neither the consent of the federal sovereign nor the consent of the State of Missouri to enforce federal law and was subject to no direct supervision by the President of the United States as an agent of the federal executive and was therefore without the jurisdiction to enforce federal law as clearly established by the 1997 U.S. Supreme Court precedent of *Printz*.

The City of Columbia Defendant misapplied the holding of *Arizona v United States*, 132 S. Ct. 2492, 2528 (2012), which declared Arizona's immigration regulation unconstitutional the U.S. Supreme Court also said, "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer. A principal example is when the Attorney General has granted that authority to specific officers in a formal agreement with a state or local government." *Id***.**, at 2511 federal-state law enforcement cooperation is permitted by agreement or specific grants of authority. In the instant matter Missouri had no agreement to enforce federal gun laws in May 2010 nor at the present time. Further, Officer Hughes was not at that time the holder of a federal law enforcement commission and therefore lacked the jurisdictional authority to enforce federal law.

## **POSTER**

The anonymously created poster that was displayed in at least October 2011, in the non-public areas of the Columbia Police Department. This poster made no reference to any warrant and stated inaccurately information about weapons arrests and listed a development website for Citizens for Justice that was never publicly disclosed and never used after April 2011. All this facts and disputes in the response to the statements of facts above sufficiently place this issue in dispute regarding the City's assertions about this retaliatory poster and make summary judgment inappropriate.

## PROPERTY AND DUE PROCESS OF LAW

The City of Columbia violated Mr. Akins' Fourth and Fourteenth Amendment rights when the seized his lawful butterfly-style pocket knife on September 11, 2012. The City further violated Akins protected property rights when in violation of Missouri law they destroyed this knife without providing him notice and hearing on same or by having obtaining the required judicial order permitting the property to be lawfully destroyed as specified below. The motion for partial summary judgment details how the seizure of Mr. Akins lawfully possessed Bersa pistol violated his Fourth Amendment property rights. Arguendo, how even if that initial seizure was lawful the retention without post-deprivation due process hearing after those charges were dismissed on November 16, 2010, the subsequent retention until April 15, 2013, without either hearing, notice or prompt return violated Mr. Akins rights to property and due process of law.

RSMo. 542.301 (2008). 1. **Property which comes into the custody of an officer or of a court as the result of any seizure and which has not been forfeited pursuant to any other provisions of law or returned to the claimant shall be disposed of as follows**: 1. . . . (d) A law enforcement officer having custody of seized property may, *at any time that seized*

*property has ceased to be useful as evidence, request that the prosecuting attorney of the county in which property was* seized file a motion with the court of such county for the disposition of the seized property. If the prosecuting attorney **does not file such motion within sixty days of the request by the law enforcement officer having custody of the seized propert**y, then such officer may request that the attorney general file a written motion with the circuit court of the county or judicial district in which the seizure occurred. Upon filing of the motion, the court shall issue an order directing the disposition of the property. Such disposition may, if the property is not claimed within one year from the date of the seizure or if no one establishes a right to it, and the seized property has ceased to be useful as evidence, include a public sale of the property. . . . 2. **The officer who has custody of the property shall inform the prosecuting attorney of the fact of seizure and of the nature of the property.** The prosecuting attorney shall thereupon file a written motion with the court with which the motion to suppress has been, or may be, filed praying for an order directing the forfeiture of the property. If the prosecuting attorney of a county in which property is seized fails to file a motion with the court for the disposition of the seized property within sixty days of the request by a law enforcement officer, the officer having custody of the seized property may request the attorney general to file a written motion with the circuit court of the county or judicial district in which the seizure occurred . . . (emphasis added)

RSMo. 513.600. (2008) Sections 513.600 to 513.645 shall be known and may be cited as the **"Criminal Activity Forfeiture Act"**.

513.605. As used in sections 513.600 to 513.645, unless the context clearly indicates otherwise, the following terms mean: . . . (4) "Criminal proceeding", any criminal prosecution commenced by an investigative agency under any criminal law of this state; . . . (8) "Seizing

agency", the agency which is the primary employer of the officer or agent seizing the property, including any agency in which one or more of the employees acting on behalf of the seizing agency is employed by the state of Missouri or any political subdivision of this state; (9) **"Seizure",** the point at which any law enforcement officer or agent discovers and exercises any control over property that an officer or agent has reason to believe was used or intended for use in the course of, derived from, or realized through criminal activity. Seizure includes but is not limited to preventing anyone found in possession of the property from leaving the scene of the investigation while in possession of the property;

513.607. 1. **All property** of every kind, including cash or other negotiable instruments, used or intended for use in the course of, derived from, or realized through criminal activity is subject to civil forfeiture. Civil forfeiture shall be had by a civil procedure known as a CAFA forfeiture proceeding. . . .6.(2) Seizure may be effected by a law enforcement officer authorized to enforce the criminal laws of this state prior to the filing of the petition and without a writ of seizure if the seizure is incident to a lawful arrest, search, or inspection and the officer has probable cause to believe the property is subject to forfeiture and will be lost or destroyed if not seized. **Within four days of the date of seizure,** such seizure shall be reported by said officer to the prosecuting attorney of the county in which the seizure is effected or the attorney general; and if in the opinion of the prosecuting attorney or attorney general forfeiture is warranted, the prosecuting attorney or attorney general shall, **within ten days after receiving notice of seizure, file a petition for forfeiture.** The petition shall state, in addition to the information required in subdivision (1) of this subsection, the date and place of seizure. **The burden of proof will be on the investigative agency to prove all allegations contained in the petition**.

513.617. 1. In the event criminal charges arising from the same activity giving rise to the CAFA proceeding are filed against any individual claiming an interest in the property subject to the CAFA proceeding, such CAFA proceeding **shall be stayed by the court until the disposition of the criminal charges.** . . . The rights of an innocent owner of property are superior to any right or claim of the state or county, and such rights shall be enforced pursuant to the provisions of sections 513.610 to 513.620. . . . 4. No state or local government agency may hold property seized for forfeiture unless a petition for forfeiture has been filed within the time limit provided by section 513.607, unless a time extension is granted by order of the circuit court. The court may extend the time for filing a petition for up to ten days for each order, **but may not extend the time for filing for more than thirty days.** (emphasis added)

## DUE PROCESS AND MISSOURI C.A.F.A.

Several Eighth Circuit precedents including the holding in *Coleman v. Watt,* 40 F.3d 255 (8th Cir. 1994) supports the proposition that Constitutional due process requirements mandate a reasonable prompt post-deprivation hearing. The *Coleman* Court said, "Coleman has alleged a seven-day delay between the seizure of his car and the first hearing. Our analysis leads us to agree with the Ninth Circuit and hold that a seven-day delay is clearly excessive.*" Id., at* 257. Further, in *Lathon v. City of St. Louis*, 242 F.3d 841 (8th Cir. 2000) the court found a §1983 action applicable "to seized weapons that were **legally possessed** by the owner and **not used** in the commission of a crime." The *Lathon* court held that the adequacy of a post-deprivation remedy was not relevant to whether the owner could maintain his 1983 claims. *Lathon,* 242 F.3d, at 844.

The City relies on the holding in *Mr. Lucky Messenger v. United States,* 587 F.2d 15 (7th Cir. 1978) in which the equitable powers of the District Court were invoked to obtain the

recovery of property seized under a valid warrant for a grand jury investigation. In its opinion remanding the case, the *Mr. Lucky* Court said, "The critical inquiry then is whether the Government has an adequate justification for withholding the plaintiff's $65,000 for over seventeen months without bringing any charges against the plaintiff." *Id.,* at 17. The court went on to say, "It appears to us that the plaintiff on remand by proving the seizure, the lack of return, and the lapse of time involved will have established a sufficient equitable basis for relief to require the Government to go forward with an attempt to justify its conduct." *Id.*, at 18. The Defendants' reliance on this case is misplaced.

In *State v. Sledd*, 949 S.W. 2d 643 (Mo.App. W.D. 1997), the Western District of the Missouri Court of Appeals summarized the guidelines for statutory construction set forth in Missouri case law: "Statutes are construed in such a way as to avoid unreasonable, oppressive, or absurd results. *Jenkins v. Missouri Farmers Ass'n, Inc*., 851 S.W.2d 542 (Mo.App.1993). **Words contained in a statute should be given their plain and ordinary meaning.** *McCollum v. Director of Revenue*, 906 S.W.2d 368 (Mo.1995). Provisions of the entire legislative act must be construed together and, if reasonably possible, **all provisions must be harmonized**. *Hagely v. Board of Educ. of Webster Groves School Dist*., 841 S.W.2d 663 (Mo.1992). Related clauses are considered when construing a particular portion of a statute. *Marre v. Reed*, 775 S.W.2d 951, 953 (Mo. banc 1989). Courts, in interpreting a particular statute, properly consider other statutes **involving similar or related subject matter**. *Angoff v. M & M Management Corp*., 897 S.W.2d 649, 654 (Mo.App.1995). All consistent statutes relating to the same subject are in pari materia and are construed together as though constituting one act, whether adopted at different dates or separated by long or short intervals. *State ex rel. Rothermich v. Gallagher*, 816 S.W.2d 194, 200 (Mo. Banc 1991)." *Id.*, at 646

(emphasis added). The Defendants interpretation of Missouri statutes ignores these guidelines.

Missouri Courts have been loathe to grant prosecutors absolute and unfettered discretion in the seizure and retention of property. In *Sledd, supra,* the court found that, "**no evidence** was introduced to substantiate the finding that an activity with a sufficient nexus to the property 'would be a felony under Missouri or federal law.' A prosecutor's sweeping, conclusory and unsubstantiated allegations do not establish the 'would be a felony' requirement. Construing the statute strictly against the state, as forfeiture statutes are required to be interpreted, a finding **by a preponderance of evidence** that a felony under Missouri or federal law has occurred and that the property is sufficiently connected to the felonious activity is mandatory." *Sledd*, 949 S.W. 2d at 650. Similar broad and conclusory allegations were found insufficient in *State v. Residence Located at 5708 Paseo, Kansas City, Mo.,* 896 S.W.2d 532 (Mo.App. W.D.1995). In ascertaining the level of possible criminal activity that would justify forfeiture, the court stated: there **must be more than a hint or suggestion of criminal activity** ..." *Id*., at 536.

In applying the property protections enacted by Missouri in the Criminal Activity Forfeiture Act. RSMo. § 513.600, et seq., (1986) the Missouri Court of Appeals for the Western District held in *State ex rel., MacLaughlin v. Treon*, 926 S.W. 2d 13 (Mo W.D. 1996) "The statute required **proof** that the '**underlying criminal action'** produced the assets or that the assets were **utilized** in the underlying criminal activity. Evidence, if believed, that implied the subject property was not acquired through legal means and, therefore, must have been acquired by illegal means was not sufficient by itself to support forfeiture of the property…**In the absence of substantial evidence** that [defendant's properties] were derived from or realized through criminal activity, a miscarriage of justice resulted from the trial court's submission of the case to the jury and the jury's subsequent verdict…" *Id*., at 16 (emphasis added).

It is well established Missouri law that all consistent statutes relating to the same subject must be read in pari materia and construed together as though constituting one act, whether adopted at different dates or separated by long or short intervals. The law with regard to seized property is construed together with the Missouri Criminal Activity Forfeiture Act. RSMo. §513.600, et seq. (2008) which provides a 14 day time limit from the time of seizure before an action must be filed in court under the act. The Missouri C.A.F.A. also includes an automatic stay provision when the property has a legal nexus to pending criminal charges.

In *Missouri State Highway Patrol v. Atwell*, 119 S.W.3d 188 (Mo. W.D., 2003), the court stated that "Property which is not subject to forfeiture should be returned to its owner. Officials have a duty to properly dispose of seized property in their custody.*" Id.*, at 193 (emphasis added) (internal citations omitted). RSMo. § 542.301 deals explicitly with the disposition of seized property. Section 542.301 states, "1. Property which comes into the custody of an officer or of a court as the <u>result of any seizure</u> and which has not been forfeited pursuant to any other provisions of law **or returned to the claimant <u>shall be</u>** disposed of as follows: ... 2. The officer who has custody of the property <u>shall inform </u>the prosecuting attorney of the fact of seizure and of the nature of the property. The prosecuting attorney shall thereupon file a written motion with the court with which the motion to suppress has been, or may be, filed praying for an order directing the forfeiture of the property. ... 3. Upon the filing of a motion either by the prosecuting attorney or by a claimant, the judge shall order notice to be given to all persons interested in the property, including the person out of whose possession the property was seized and any lienors, of the time, place and nature of the hearing to be held on the motion. ...." (emphasis added)

## FAILURE TO TRAIN LIABILITY OF COLUMBIA

The City failed to train Chief Burton (see his affidavit ECF 82-29) who declared that the in 2011, lobby was not open for expressive activity or assembly and the City employee in 2011, that ordered Mr. Akins to turn off his camera in that public lobby where: 1. citizens gathered at the dedicated memorial to remember fallen CPD Officer Molly Bowden; 2. where media advisories of arrests were communicated to media and the public; 3. where information about the Columbia Police Department is communicated to the public; 4. Where citizens were directed to obtain complaint form(s) to file grievances against Columbia Police Officer all made this CPD public lobby, that is open 24 hours a day, a public forum for expressive communications.

Further the failure to train on Missouri law that butterfly-style pocket knife with locking latch and blade of less than four inches could be lawfully concealed in Matt Akins' pocket on September 11, 2012. And that when a citizen, Matt Akins, on May 09, 2010, who was over the age of 21 was seized from his vehicle's passenger compartment that he was entitled to the statutory exemption in Missouri law that permitted him to lawfully conceal a firearm on his person.

The U.S. Supreme Court considered the failure to train standard of municipal liability in *City of Canton, Ohio v Harris,* 489 U.S. 378 (1989). The Court held that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact." The Court stated "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983." *Id., at* 388-389. Similarly, in *Polk County v. Dodson,* 454 U.S. 312 (1981), the Court stated that "a munici-

pality can be liable under § 1983 only where its policies are the moving force [behind] the constitutional violation. Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983." *Id.*, at 388-389.

The 8th Circuit also considered the failure to train standard of municipal liability in *Parrish v. Ball,* 594 F.3d 993 (8th Cir 2010). The Court reasoned "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [local government] ... Instead, to satisfy the standard, [the plaintiff] must demonstrate that in light of the duties assigned to specific officers ... the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need." Id., at 998. In *Brockinton v. City of Sherwood*, 503 F.3d 667 (8th Cir 2007) held that "[a] supervisor may be held individually liable under § 1983 if he directly participates in the constitutional violation or if he fails to train or supervise the subordinate who caused the violation. The standard of liability for failure to train is deliberate indifference. The standard of liability for failure to supervise is "demonstrated deliberate indifference or tacit authorization of the offensive acts." *Id.*, at 673.

The inadequate training in; the law of seizure; firearms; and post-deprivation due process of law that the CPD officers received "amounts to deliberate indifference to the rights of persons with whom they come into contact." Moreover, the need for police to understand state and  applicability of federal law prior to said law is obvious, and a lack of understanding is likely to result in the violation of constitutional rights, and did so in this case. Thus the City of

Columbia can reasonably be said to have been "deliberately indifferent to the need" for adequate training and subject to liability under § 1983.

## CONCLUSION

Plaintiff Akins has sufficiently disputed Defendants' Statement of facts for place issues in dispute so that summary judgment should be denied,

Respectfully submitted,

_____/s/ Stephen Wyse_____
Stephen Wyse, MO Bar # 49717
609 E. Broadway
Columbia, MO 65201
(573) 449-7755
(573) 449-7557 Fax

## CERTIFICATE OF SERVICE

I hereby certify that true copy of the above and foregoing with attachments was filed with the Clerk of the Court and served upon counsel for all parties by ECF transmission on this 10th day of June 2016. And the digital copy of exhibits too large to be filed electronically was mailed this same date to this Honorable Court and to Counsel for the City Defendants Brad Letterman at 931 Wildwood Drive, Suite 201, Jefferson City, Mo 65109 and to Counsel for the now terminated County Defendants Elizabeth Weber at Rogers, Ehrhardt, Weber & Howard, LLC. At Seven Oaks Business Center, 302 Campusview Drive, Ste. 204, Columbia, MO 65201 on this same date.
_____/s/ Stephen Wyse_____

## CERTIFICATE OF COMPLIANCE

These suggestions in opposition did not exceed the 35 pages, excluding statement of facts, granted by leave of the court.
_____/s/ Stephen Wyse_____
Stephen Wyse, MO Bar # 49717