**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

MATTHEW STEPHEN AKINS,      )
                                      )
              Plaintiff,      )
                                      )
v.                               )     No. 2:15-CV-04096-NKL
                                      )
CITY OF COLUMBIA, et al.,      )
                                      )
              Defendants.    )

**ORDER**

Plaintiff Matthew Stephen Akins alleges that Defendants violated federal and state laws in connection with their various stops and arrests of him between May 2010 and May 2013. At the time of the alleged incidents, Defendant Kenneth Burton was the Chief of the City of Columbia, Missouri Police Department, and Defendants Eric Hughes, Rob Sanders, Roger Schlude, and Michael Palmer were City of Columbia police officers.

Akins complains of his May 9, 2010 arrest and the seizure of his gun; a June 6, 2010 traffic stop; a July 27, 2011 incident in a Taco Bell parking lot; his September 11, 2012 arrest and seizure of his butterfly knife; a poster of him that was displayed in a Police Department briefing room; and other incidents involving alleged retaliation, failure to train, malicious prosecution, and conspiracy.

Defendants Burton, Hughes, Sanders, Schlude, Palmer, and the City of Columbia move for summary judgment, Doc. 81, on all claims. Akins moves for summary judgment in part. Doc. 91. Defendants' motion for summary judgment is granted and Akins' motion for summary judgment is denied.

# I. Background[1]

## A. May 9, 2010 incident and Officer Hughes

### 1. The arrest

On May 9, 2010, Officer Hughes stopped Akins on a routine DWI checkpoint in Columbia. Akins was driving a 1997 Toyota Camry and Hughes did not know who Akins was at the time of the stop. When Hughes was speaking with Akins, he observed that Akins' eyes were bloodshot and his hands shook as he handed Hughes his documents. Hughes also smelled what he believed to be the smell of marijuana.[2] Hughes asked Akins to step out of the car. Akins began rolling up the window, at which point Hughes opened the door himself and asked Akins to step out, which Akins did. As Akins stepped out, Hughes saw Akins move his right hand close to his leg and quickly place an unknown item in his right pants pocket. Based on Akins' nervous demeanor and the quick motion, Hughes believed Akins could have placed a weapon in his pocket. To check Akins' pocket and retrieve the unknown item, Hughes moved aside a paper towel that was in Akins' pocket. Based on Hughes' training and experience, the paper towel was wrapping what to Hughes felt like marijuana stems, seeds, and leaves.

---

[1]    Unless otherwise noted, the facts recited are those which are properly supported and undisputed.

[2]    Hughes has been a Columbia police officer since 2005 and has had training. Akins disputes that Hughes could have detected the odor of marijuana. Akins states in an affidavit that he (Akins) had not "smoked or ingested marijuana" that day, he knows what marijuana smells like, and he did not smell marijuana in his car at the time of the stop, Doc. 104-1, suggesting Hughes is fabricating his statement that he believed he smelled marijuana. However, Akins admits in his reply suggestions to the City Defendants' motion for summary judgment that, "[w]eirdly," many things smell like marijuana, including various other plants, beer, Axe touch spray, body odor, and skunk. Doc. 110-3 (Exh. 59). Also, Akins admitted he possibly did have marijuana on his person or in his car at the time. Doc. 82-1, pp. 14 and 18 (Akins Depo. pp. 56 and 71). Finally, what appeared to be marijuana was found in Akins' car. On this record, no reasonable juror could find that Hughes was lying when he said he believed he smelled marijuana. Akins has not created a genuine dispute of material fact concerning Hughes' belief.

When Hughes patted Akins down, Hughes felt a gun near Akins' waist. The gun, a .380 Bersa, was in a holster attached to Akins' belt, covered by his shirt. Akins did not tell Hughes about the gun at any time before or after getting out of the car. Akins says Hughes' actions, from the time of opening the door to when he performed the pat down, did not provide reasonable time to tell Hughes about the gun. When Hughes felt the gun, Hughes pushed Akins off-balance and against the car, and yelled, "Gun!" Hughes asked Akins whether he had a concealed carry permit. Akins said he did not and that his attorney told him he did not need one to carry a gun in the car.

Hughes later wrote in the offense report that "[t]he gun was discovered to be loaded with 11 bullets in the magazine and 1 round in the chamber. The handgun was readily capable of immediate lethal use and was concealed under [Akins'] shirt, not visible to others." Doc. 91-3, p. 20 of 22 (Offense Report). Akins admits the gun contained bullets. But he says there was no bullet in the chamber when Hughes removed the gun from the holster. Akins says when Hughes drew the slide back to check on whether there was a round in the chamber, Hughes' action chambered the round. Doc. 91-1, p. 2.

Akins admits that a tissue removed from his pocket could possibly have contained "remnants of marijuana" or "marijuana byproducts." Doc. 82-1, p. 14 (Akins Depo., p. 56). Another officer searched Akins' car and located a plastic baggie under the driver seat, containing what the officer reported to be marijuana. Akins admits he had used marijuana at some time and that it was possible that what the officer found in his car was his marijuana. *Id.*, p. 18 (Akins Depo., p. 71). Hughes arrested Akins for drug possession and unlawful use of a weapon.

### 2. Return of the gun

The Boone County prosecutor subsequently charged Akins with unlawful use of a

weapon, a class D felony.  Then on November 16, 2010, the prosecutor dismissed the charge, *nolle prosequi* "and possession of Matthew Akins Bersa 380 pistol was maintained by the Columbia Police Department pursuant to the recommendations of the Boone County Prosecutor's Office."  Doc. 4, p. 8 of 40, ¶ 23 (Akins' Amended Complaint).

In February 2012, Akins' defense attorney emailed the assistant prosecutor who had handled the case, asking if Akins' gun could be returned to Akins.  The assistant prosecutor responded that that should be alright and asked whether Akins had proof of ownership.  No evidence in the record shows Akins' attorney responded to the question about proof of ownership, or that the prosecutor relayed the request to the City police department.

The City police department was performing a routine audit in October 2012 and according to the City, in the course of the audit it learned it still had Akins' gun.[3]   At the time, Akins had a pending felony charge relating to an arrest for possession of a knife.  The City sent Akins a letter one week later, informing Akins that the gun was available to be picked up by a third party, as Akins had a pending felony charge.  The evidence custodian of the Columbia Police Department, Michelle Heater, also explained to Akins in a phone call on October 24, 2012 that a third party could pick it up.  No third party came to get it.

In February 2013, Akins emailed Chief Burton and the Boone County prosecutor, requesting return of the gun.  The Boone County Prosecuting Attorney's office notified Heater on March 20, 2013 that they no longer needed the gun.  Akins was told on March 28, 2013 that

---

[3]        Akins states that a printout showing the history of the gun charge, produced by the City police department in discovery in this lawsuit, shows that the City police department knew by January 2011 that the charge had been dismissed.  *See* Doc. 91-10 (Akins' Exhibit 12, p. 2).  The printout does not say that, and the printout does not otherwise reflect, nor is there evidence in the record of, who had access to the printout, or how and by whom the information it contains was used.

Case 2:15-cv-04096-NKL   Document 117   Filed 08/02/16   Page 4 of 37

he could pick it up any time.[4]   He picked it up on Aril 15, 2013.

**B.      June 6, 2010 incident and Officer Schlude**

On June 6, 2010, around 6:50 p.m., Akins made an illegal U-turn while driving and Officer Schlude stopped him.  Akins admits the stop was lawful.  Doc. 4, p. 8 of 40, ¶ 25.  Akins had two passengers with him, including one in the back seat.  Akins submitted the affidavit of one of his passengers, K. Jones, who said that after pulling Akins over, Schlude asked Akins whether there were any illegal drugs or weapons in the car.  Doc. 91-7 (Jones Affidavit).  Akins told Schlude there was a legal rifle on the rear floorboard.

Schlude does not have an independent recollection of the interaction with Akins.  The dispatch system records reflected, and Schlude would have been advised at the time, that Akins had a type two indicator, meaning Akins was known to be armed and violent; and that Akins' passengers had type one indicators, meaning they were known to be violent.  Akins also had a felony weapons charge at the time.  According to dispatch records, Schlude told dispatch that there was a rifle in the car and requested backup.  Schlude said that based on the facts in the dispatch record, he would have approached the situation with caution given that Akins was known to be armed and violent, the two individuals were known to be violent, and there was a rifle in the car.

Schlude ordered Akins and the two passengers out of the car.  All three were handcuffed and searched by a second officer who arrived at the scene.  Jones says this second officer was searching them for "dangerous objects[.]"  *Id.*  The three were directed to sit on the curb while Schlude searched the car.  Akins did not consent to the search.  Akins says Schlude moved some items out of the car during the search and the entire encounter lasted about 20-30 minutes.

---

[4]        The felony knife charge was amended in March 2013 to driving while revoked or suspended and failure to yield right-of-way.

5

Schlude issued Akins a citation for the illegal turn. Akins says he asked Schlude whether he had "done anything wrong" with the gun and what "the protocol" was for a situation like the one he had just found himself in. Doc. 91-1, p. 5 (Akins Affidavit). He says Schlude responded that it depended on the officer, i.e., some would see the gun in the car, pull their own gun and shoot him dead, then testify that they had feared for their life and the charge would be dismissed. *Id.*

### C.    July 27, 2011 incident and Officer Sanders

Officer Sanders was patrolling in Columbia on the night of July 27, 2011 when he saw a car exit what he considered a high-crime neighborhood.[5] Sanders began following it and observed that the occupants became animated, and the driver began behaving differently once the driver noticed him following, engaging in what Sanders' training and experience had taught him were avoidance techniques, i.e., changing lanes multiple times and turning into a parking lot. According to Sanders' training and experience, that behavior indicated the occupants were trying to avoid contact with the police. Akins was the driver and he admits he noticed the police car behind him, Doc. 92, p. 4 of 47, although he did not know at the time that it was Sanders, Doc.

---

[5]      Akins argues that Sanders' averment concerning the car having come out of a "high crime" neighborhood should be discounted as speculation because it is supported only by Sanders' "self-serving opinion." Doc. 104, pp. 12-13 of 46. In the summary judgment context, "the self-serving nature of affidavits, interrogatory answers, or deposition testimony," in the sense that such materials support a party's case or defense, does not "serve to make such evidence inherently infirm." *Stewart v. Rise, Inc.*, 791 F.3d 849, 860 (8th Cir. 2015). "As such, [courts] generally do not discount such evidence at the summary judgment stage." *Id.* Akins states in his affidavit that Sanders began following him as he turned north from Worley Street onto Providence Road. Doc. 91-1. Sanders had been hired by the Columbia Police Department as a police officer in 1993, had had training throughout his employment, and the record reflects that part of his job was patrolling Columbia. A trained, experienced, 18-year veteran police officer is competent to opine whether a neighborhood is "high crime." Moreover, Akins offers no evidence demonstrating a dispute of fact concerning Sanders' averment that the neighborhood Akins left was in fact "high crime." There is no genuine dispute of fact with respect to Sanders' description of the neighborhood as high crime.

82-1, p. 36 of 88 (Akins Depo. p. 147). Akins admits that as he was driving, he "deliberately changed lanes two separate times to determine if they were being followed by" the police car, and "both times, [the police car] mirrored Akins' lane changes." Doc. 92, p. 4 of 47. Akins' passenger, M. Carter, "retrieved a video camera and began recording events as they unfolded." *Id.*

Sanders contacted Joint Communications. He recited a license plate number and was given the name[6], and asked for priors, then stated he was "going to try to check on this vehicle here, probably at Taco Bell." Doc. 82-40, Exh. 20 at 00:00—1:04 (audio recording). Joint Communications checked whether there were units to assist. Officers Scott Hedrick and Mike Parson responded that they were close.

Akins went to the drive-through and ordered food. Sanders followed Akins' car and while Akins was waiting, Carter turned around to continue filming out the back window. Sanders saw the camera's light shine at him and waived. Sanders had recently been trained that individuals will use phones or cameras to video police to try to deter contact by officers. Sanders parked in the Taco Bell lot. Akins got his order and pulled into an open parking spot in the Taco Bell lot. Sanders saw the occupants begin to watch his patrol car. Officers Hedrick and Parsons pulled into the lot, driving a K-9 unit. Sanders had not asked for a K-9 unit. No evidence in the record reflects Sanders told Hedrick and Parsons where to park.[7]

Sanders never activated his lights or sirens. There is no evidence that his car was parked

---

[6]    Akins' name did not come up. He was driving his mother's car and her last name is not Akins.

[7]    There appears to be a dispute of fact, or the evidence—video, photo, and a diagram—is at least unclear, concerning exactly where Hedrick and Parsons' police car was parked in relation to Akins' car. Akins claims their police car was parked so that he could not easily pull his car out of his parking spot. Defendants claim Hedrick and Parsons' car did not block Akins, and his way out was open at all times during the Taco Bell encounter.

7

in such a way as to block Akins' car. Sanders walked to Akins' driver-side window. After greetings were exchanged, Sanders asked Akins, "You got a driver's license I could see?" Akins asked Sanders what his probable cause was, and Sanders replied, "I don't have to have probable cause." Akins also asked Sanders if he was conducting a traffic stop and Sanders said he was not. Sanders asked Carter if he had identification, Carter indicated he did, and Sanders asked if he could please see it. Sanders also asked whose car Akins was driving and Akins said it was his mother's. Akins and Carter gave Sanders their identification, and Akins said to Sanders that he believed he was responding to an order by a law enforcement officer, rather than a casual request. Sanders said, "All right. Sit tight, guys."

Officer Hedrick told Officer Parson to get his dog out of their car, but to stay back. Officer Parson did so, "to introduce the dog to new things, new sights, sounds, and trying to get him used to being a police dog." Sanders did not tell them to take the dog out of the car or otherwise tell them where to stand or how to handle the dog. Officer Hedrick went to the passenger-side window of Akins' car. Hedrick said to Akins that Sanders was "just checking you," that he and Parsons happened to be in the area, and said "it was just safety issues." Hedrick and Parsons never drew their weapons or activated their patrol car's lights or sirens.

Sanders contacted Joint Communications again. He said, "I'm at a check subject at Taco Bell at Providence and the Loop [UNINTELLIGIBLE] I see about name and date."[8] Doc. 108-9, Exh. A at 00:00—00:11 (audio recording). Joint Communications asked, "Which do you want, a traffic stop or are you on a different check subject?" *Id.* at 00:17-00:22. Sanders responds, "It's

---

[8]     Akins says in his Statement of Facts that an Internal Affairs report concerning the incident reflects that Joint Communications entered Sanders' communication as a "traffic stop" rather than a "check subject" or "suspicious vehicle." Doc. 92, p. 6 of 47, ¶ 8. Akins does not create a genuine dispute of material fact with such evidence. Whatever Joint Communications entered, the recording does not reflect Sanders called in a "traffic stop," it reflects Sanders called in a "check subject."

8

the same incident but it's not a traffic stop, it's, I'm out with [LICENSE PLATE NUMBER] but it's not a car stop." *Id.* at 00:22—32. One minute later in the recording, Sanders gave Joint Communications Akins' and Carters' names and birthdates to run. *Id.* at 01:32—2:04. Sanders later asked Joint Communications whether it could add to the registration that the subjects were "Columbia citizens on patrol."

Sanders returned to Akins' car after what Akins says was no more than one minute and thirty seconds, returned the identification, told Akins and Carter they were "free to go," and thanked them for their cooperation. Sanders then pointed out an open beer bottle on the floor of the car. Akins said it was his mother's and Sanders offered to throw it away.

Sanders contacted Joint Communications again and said he would be out report-writing unless assistance was needed. Doc. 108-9, Exh. A at 13:32—13:48. Joint Communications said, "Negative," and asked, "What did you find about your check subject at Taco Bell?" *Id.* at 13:48-13:55. Sanders said he tried to clear it himself but the computer probably crashed and asked that it be shown as "clear, no report." *Id.* at 13:56—14:05.

A Columbia Police Department Internal Affairs investigation concluded the incident at Taco Bell was a detention rather than consensual contact under all the circumstances and that Sanders had violated a police department guideline concerning seizure of persons within the limits of the Fourth Amendment as interpreted by the judiciary.

### D. September 11, 2012 incident and Officer Palmer

On September 11, 2012, Officer Palmer stopped Akins, who was driving a white Kia, after Akins failed to yield right-of-way at a four-way stop when Palmer was already in the intersection. At the time he stopped the Kia, Palmer did not know who was driving it.

Akins could not produce a driver license. But he told Palmer that he was driving to a

Citizens-for-Justice-related event and was therefore covered to drive under his limited driving privilege. Doc. 91-1, p. 12 of 16 (Akins Affidavit). Palmer told another officer who arrived on the scene to assist that Akins was with Citizens for Justice. When Palmer ran Akins' name through the MULES system, Akins' driving privilege was reported as revoked without any limited privileges.[9] Akins could not provide proof of insurance. Palmer arrested Akins for driving while revoked, failure to yield right of way, and failure to maintain financial responsibility.

In conducting a search incident to arrest, Palmer found a butterfly knife in Akins' right front pants pocket. Based on his training and experience, Palmer knew a butterfly knife was a type of knife in which the handle is hollow and split into two parts that connect to the blade with two loose pins. To open a butterfly knife, the blade pivots around the pins in an arc. Based on his training at the police academy, knowledge, and experience, Palmer knows that a butterfly knife can be opened one-handed by the operation of gravity or the application of centrifugal force. Doc. 82-32, p. 2 of 4 (Palmer Affidavit). The sharp part of the butterfly knife's edge was about 3½ inches long; measured from the tip to the hinges, the blade is 4" long. In addition to the driving and insurance violations, Palmer also arrested Akins for unlawful use of a weapon and possession of a prohibited weapon, under Mo. Rev. Stat. § 571.020 and § 571.030.

Prior to submitting the probable cause statement, Palmer checked with a supervisor about the butterfly knife. The supervisor told Palmer the knife was illegal. Palmer wrote in the probable cause statement that the knife was designed to be opened from the handle by gravity or by the application of centrifugal force.

---

[9] Akins claims his attorney had cleared up the driver license issues and he was not actually revoked at the time. But he does not demonstrate a dispute of fact concerning what MULES showed about his driving privilege when his name was run on September 11, 2012.

Akins continued his reporting activity for months following the September 11, 2012 encounter with Officer Palmer.

In May 2013, the charges were amended to driving while revoked or suspended, and failure to yield the right of way.

**E.    The Akins poster and Citizens for Justice website**

Prior to the creation of the Citizens for Justice website, Akins had at least nine contacts with the Columbia Police Department that had resulted in his arrest.  He began construction of the website in June 2010 and the Columbia Police Department became aware of it in December 2010.[10]  The website concerned law enforcement interactions with the public, including alleged police misconduct by the Columbia Police Department.  Akins' systems administrator accidentally erased the website in the fall or winter of 2012.  Doc. 82-1, p. 106 (Akins Depo. pp. 261-62).  But Akins says Citizens for Justice still has active YouTube and Facebook pages. Doc. 104, p. 30, para. 141.

At some point in 2011, a poster concerning Akins was put up in the Police Department's briefing room, an area not generally open to the public.  No evidence in the record shows who created or put up the poster.  The poster had a photograph of Akins.  It stated he drove a silver Pontiac Grand Prix and had arrests in the system for weapons violations, including carrying a pistol concealed on his person.  It also stated Akins ran a website, and gave the website address (which was for Citizens for Justice).  Doc. 82-21, Defs. Exh. 26 (poster).  The Police Department does not have a policy concerning posters being displayed within the Department.

---

[10]    On December 27, 2010, Eric Dearmont, director of the Columbia Police Officers' Association and an attorney, contacted Akins' web administrator and relayed the following: "While we do not have conceptual concerns about the website itself, we have been informed that the site may contain the personal contact information (address, etc.) of our officers.  Please be advised that this presents a safety risk to our officers and their families. We ask that in developing this site you omit all personal information.  Thank you for your consideration."

11

At the time the poster was up, Akins was approaching police offices at night while they were responding to calls and otherwise performing their duties, recording the officers' activities with a camera in night vision mode and that displayed an illuminated red dot when it was on. Doc. 82-29, Defs. Exh. 35 (Burton Affidavit); Doc. 82-1, pp. 31, 36, 39, 48, 110, 113, and 119 of 188 (Akins Depo., pp. 121, 143, 155, 190, 191, 278, 279, 291, and 315).   Chief Burton opined that the poster promoted  Akins' and officers' safety.   At some point after Akins began filming police officers, Chief Burton or Jill Schlude advised the Police Department that Akins had the right to film.  Doc. 82-29.

**F.    Other incidents**

**1.    May 19, 2010 incident and Officer Quintana**

On May 19, 2010, Akins was pulled over by Columbia Police Officer Thomas Quintana to check window tints and for expired plates.  Akins was arrested pursuant to two, active arrest warrants.

**2.    Email and meeting with Chief Burton in December 2011**

Chief Burton had given Akins his personal email address and they exchanged emails.  On December 6, 2011, Akins wrote in an email to Burton, "Although I was skeptical when you first became Chief and at certain times during your tenure, I have come to respect you and, after living through the Randy Boehm Administration, know it could be a lot worse.  All in all, I appreciate what you're doing and wanted to tell you to keep it up."

Akins also met with Chief Burton in December 2011.  Burton told Akins it was his right to film officers.  Burton also said it was his "goal to put them out of business, in the context that I hoped there would be no negative actions of officers to film."  Doc. 91-11, Pl. Exh. 13 (Pl.'s Interrogatories to Chief Burton).  Burton was aware that some officers thought Akins should not

be filming, but did not recall any specifics. Doc. 92-6, Pl. Exh. 3 (Pl.'s Interrogatories to Chief Burton).

### 3.    October 14, 2011 incident and Officer Hughes

Akins was in a Columbia bar, Salty's, on October 14, 2011, at or after the 1:30 a.m. closing time.  Officer Hughes was on patrol in the area.  Hughes used his patrol car spotlight to illuminate the interior of the bar and see people who were still there, a standard procedure for Columbia police in 2011 that had been adopted from the Lincoln, Nebraska police department. Columbia police had found that people loitering in and around bars after closing time often led to fistfights and other peace disturbances, so had adopted the procedure to encourage patrons to leave bars after closing time and avoid loitering around them.[11]  The police officers also used the spotlights in 2011 to identify individuals and gain visibility at night, because intoxicated persons were often walking the streets.

Numerous people were leaving Salty's after 1:30 a.m. on October 14, 2011.  Akins was filming from inside the bar.  Hughes approached a bar employee and told him everyone had to be out of the bar, or the  bar would be fined for having patrons inside after 1:30 a.m..  Akins was working there as a videographer.  No evidence in the record shows that Hughes knew Akins was a bar employee when Hughes approached the bar employee.

Akins walked up to Hughes outside the bar.  At the time, Akins had at least one outstanding arrest warrant, so Hughes arrested him.  While Hughes was arresting Akins, Akins asked him about a poster hung in the Columbia police department.  Hughes said he thought the poster was hung because Akins had a warrant out for his arrest.

---

[11]    Under Missouri law, the premises of a person with a license to sell intoxicating liquor must be a "closed place" from 1:30 a.m. to 6 :00 a.m.  Mo. Rev. Stat. § 311.290.  A closed place is defined as a place where all doors are locked and no patrons are in the place or about the premises.  *Id.*

13

#### 4. October 16, 2011 incident and Officer Corcoran

Akins was with his brother in a crowd of people leaving Salty's Bar around closing time on October 16, 2011, when Akins claims he was singled out by Columbia Police Officer Corcoran with a spotlight from the officer's police car. Akins says, "[A]s we videotaped we walked sideways across an adjacent parking lot to demonstrate…we were being followed by the light in an area crawling with people." Doc. 91-1, p. 11 of 16 (Akins Affidavit).

#### 5. Filming in the Police Department lobby in 2011

The Columbia Police Department has a lobby that is open 24 hours a day. It contains a media book, a beat map, informational brochures, and a memorial to a slain Columbia police officer. The media book contains copies of incident reports from the prior night for interested media members. The beat map assists citizens in determining the beat they are in for purposes of filing police reports. Sometime in 2011, Akins was filming a person who was wearing a Ku Klux Klan hood and was in the lobby to pick up a complaint form. A Community Service Aide (CSA), who is not a defendant in this case, told Akins he could not film in the lobby and to turn off the camera, which Akins did.

Akins later followed up with a Police Department Public Information Officer, Jill Schlude. Schlude told Akins the CSA had been wrong when he said filming in the lobby was not allowed and told Akins to stop filming. Schlude also said the Police Department had had to follow up with the CSA so he would know what he told Akins was wrong. The CSA was not disciplined for asking the filming to stop.

#### 6. Media Training Day

In October 2015, the Police Department held an invitation-only "Media Training Day" for its "Media Partners." Doc. 100-2. The email invitation stated that "[d]ue to space

limitations, and to provide the best experience possible, we are limiting the training to 30 participants." *Id.* The invitation was extended only to traditional media members, including local television stations and newspapers. Doc. 108-3, p. 4 of 6 (Jill Schlude Affidavit). A person who had been invited forwarded the information to Akins, who attempted to RSVP to the Police Department in order to attend. A Police Department public information officer replied to Akins, apologizing if he thought he was registered, and explaining the event was invitation-only and he had not been invited.

### 7. The Columbia Police Department Facebook page

The Columbia Police Department has had a Facebook page since at least 2011. From 2011 to the spring of 2016, the page has always contained substantially the following statement:

> The purpose of this page is to provide an opportunity for the Columbia Police Department to supply information to the public about department events, crime alerts, and other important information. We encourage you to submit comments, but please note that this is not a public forum. Comments posted to this page will be monitored. The Columbia Police Department reserves the right to remove inappropriate comments.

Doc. 108-3, Defs. Exh. G (Affidavit of Jill Schlude). Sometime after 2011, the Department added examples to the statement.

Akins states that he had posted several Citizens for Justice videos on the Police Department's website, but then in the summer of 2011 found that his videos were no longer there and he could no longer post anything. He said that in fact, he saw that all posts by others outside the Department had been removed, so he contacted the public information officer, Jill Schlude. Schlude told him the City did not have a formal social media policy, administrators had decided to work on one, and until a policy was in place, the Police Department would be posting its own content.

15

Schlude further explains that that approach was a City-wide one, not limited to the Police Department. Since the summer of 2011, no one can post original links to videos on the Police Department's Facebook page and no one can post comments that do not relate to the original post by the Police Department. In 2011-2012, comments to the page that were not related to the topic of the post under which they were made would have been considered inappropriate, and would have been removed. This is true for all users. Schlude has also reviewed the topics of postings from 2011-2012, and found none related to the subjects of Akins' Citizens for Justice videos. While memos concerning a social media policy have been prepared and circulated, the City has not adopted a social media policy.

## II.  Discussion

A movant is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P.56(c). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding summary judgment, the court views the evidence in a light most favorable to the non-moving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). "However, a 'nonmovant must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial.'" *Id.* (quoting *F.D.I.C. v. Bell*, 106 F.3d 258, 263 (8th Cir. 1997)).

"[T]o survive a motion for summary judgment under § 1983, the plaintiff must raise a

genuine issue of material fact as to whether (1) the defendants acted under color of state law, and (2) the alleged wrongful conduct deprived the plaintiff of a constitutionally protected right." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (citing *Cooksey v. Boyer*, 289 F.3d 513, 515 (8th Cir. 2002)). Further, personal involvement is required in order for an individual to be liable under § 1983. *Beck v. Lafleur*, 257 F.3d 764 (8th Cir. 2001). "Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed." *Wilson v. Northcutt*, 441 F.3d 586, 597 (8th Cir. 2006).

Further, a police officer is entitled to qualified immunity unless the plaintiff can establish that the officers' conduct violated a constitutional right and the constitutional right was so "clearly established" at the time of the alleged violation that a reasonable officer would have known that his conduct was unlawful. *Rohrbough v. Hall*, 586 F.3d 582, 585 (8th Cir. 2009) (*citing Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Court has discretion to choose which of the two aspects of qualified immunity to address first. *Pearson v. Callahan*, 553 U.S. 223, 239 (2009).

### A. The May 9, 2010 incident and Officer Hughes

#### 1. The stop and arrest

Akins alleges that on May 9, 2010, he was seized by Officer Hughes without probable cause, because it was lawful to carry a concealed gun in a car. Doc. 4, pp. 6-8 of 40.

Hughes arrested Akins for possession of an illegal substance, as well as unlawful use of a weapon, Mo. Rev. Stat. § 571.030. Because Hughes at minimum had probable cause to arrest Akins for possession of marijuana, Akins' claim concerning the arrest for the gun fails. "[A]n officer need only demonstrate probable cause to carry out an arrest for any offense arising out of an incident. That the officer may have had a mistaken belief that she had probable cause to arrest

17

for other offenses is immaterial so long as probable cause existed for the one offense." *Smithson v. Aldrich*, 235 F.3d 1058, 1062 (8th Cir. 2000).

"To determine whether an officer had probable cause to arrest an individual, [the Court] examine[s] the events leading up to the arrest, and then decide[s] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *United States v. Winarske*, 715 F.3d 1063, 1066 (8th Cir. 2013) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)); *see also United States v. Patrick*, 776 F.3d 951, 955 (8th Cir. 2015) (noting that probable cause is evaluated based on the "totality of the circumstances at the time of the arrest"). The officer need not have "witness[ed] actual criminal activity or ... collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest. Instead, the mere 'probability or substantial chance of criminal activity ...' is all that is required." *Winarske*, 715 F.3d at 1067 (citation omitted) (quoting *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005)).

Here, Hughes stopped Akins at a routine DWI check point. Hughes smelled what he believed was the odor of marijuana coming from Akins' car, and observed that Akins' eyes were bloodshot, his hands were shaking, and he was acting nervously. Hughes also observed Akins make a quick movement as Akins got out of the car, placing an unknown item in his right front pants pocket. Based on Hughes' training and experience, he believed Akins' actions were indicative of an individual who was using or who possessed a controlled substance, and who may have placed a weapon in his pocket. In performing the search, Hughes felt what he believed to be marijuana leaves, stems and seeds wrapped in a paper towel in Akins' pocket, and a search of the vehicle turned up a baggie of what Hughes believed to be marijuana. Akins admitted in deposition that the material may have been his marijuana. Hughes had probable cause to arrest

18

Akins for drug possession.

Akins' argument that the material seized was not ultimately proven to be marijuana or was not enough marijuana to be prosecuted for under local ordinance does not show Hughes lacked probable cause. "[T]he mere 'probability or substantial chance of criminal activity ...' is all that is required." *Winarske*, 715 F.3d at 1067 (quoting *Mendoza*, 421 F.3d at 667). *See also New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015) (A "police officer can have probable cause to seize what appears to be a controlled substance that is later determined to be something else.") (and citations therein).

Because Hughes had probable cause to seize Akins for drug possession, Akins cannot make a claim with respect to his seizure for the gun violation under Mo. Rev. Stat. § 571.030. Nonetheless, Hughes also had probable cause to arrest him for a violation of § 571.030. Under that statute, it is a crime to carry a concealed knife, firearm, "or any other weapon readily capable of lethal use," on or about one's person. § 571.030.1(1). The prohibition is subject to some exceptions, including instances in which the actor is "transporting such weapons in a nonfunctioning state or in an unloaded state when ammunition is not readily accessible or when such weapons are not readily accessible," or when the actor has a "valid concealed carry permit[.]" § 571.030.3 and .4. Here, in performing a pat down of Akins' person outside the car, Hughes felt a gun in a holster near Akins' waist. The gun was concealed by Akins' shirt. The gun was loaded. Akins did not have a concealed carry permit. These facts provided Hughes with probable cause to arrest Akins for violation of the statute.

Akins argues that he was free to transport the gun in his car, notwithstanding the lack of a permit, based on the transportation exception to the statute and because he told Hughes so. But the gun did not appear to be in a nonfunctioning state and was in fact loaded. Akins argues that

Case 2:15-cv-04096-NKL   Document 117   Filed 08/02/16   Page 19 of 37

although the gun had bullets in it, there was no round in the chamber until Hughes drew the slide back, so the gun was not readily capable of lethal use at the time he had it on his person. But even if there had been no chambered round, the gun would still have been readily capable of lethal use for purposes of the statute. "[T]here is no requirement for a firearm to be loaded or operational for a defendant to be convicted under § 571.030.1." *State v. Wright*, 382 S.W.3d 902, 905 (Mo. 2012) (and citations therein).

Akins also argues that he stepped out of the car because Hughes asked him to and he did not have sufficient time to tell Hughes about the gun before Hughes detected it. Even assuming Akins did not have sufficient time, and Akins otherwise met the transportation exception to the statute to have been carrying the gun in the car, no case addresses such a scenario. Therefore the contours of Akins' right would not be so clearly established that a reasonable officer would have known that Hughes' conduct violated a right of Akins. Hughes would therefore be entitled to qualified immunity.

### 2. Return of the gun to Akins

Akins also alleges that his gun was wrongfully held from him from May 9, 2010, until April 15, 2013 when he picked it up. Doc. 4, p. 8 of 40, ¶ 23. Akins does not allege who allegedly wrongfully held his gun, only that it was "maintained by the Columbia Police Department." *Id.* Since the Columbia Police Department is not a defendant in this case, and is not a suable entity, *see Catlett v. Jefferson County*, 299 F.Supp.2d 967 (E.D. Mo. 2004) (*citing American Fire Alarm Co. v. Vd. Of Police Comm'rs of Kansas City*, 227 S.W. 114, 116 (Mo. 1920)), Akins may be attempting to bring this claim against the City of Columbia. However, the City of Columbia cannot be liable under § 1983 on a *respondeat superior* theory. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Further, Akins has not alleged that the City of

Columbia adopted a policy or had a custom that has harmed him, nor identified any such policy or custom. The claim fails for this reason alone.

Even if Akins had brought a cognizable claim against the City, it would still fail because he did not suffer a constitutional violation. "When seizing property for criminal investigatory purposes, compliance with the Fourth Amendment satisfies pre-deprivation procedural due process as well." *Rodgers v. Knight*, 781 F.3d 932, 941 (8th Cir. 2015) (*citing Walters v. Wolf*, 660 F.3d 307, 314 (8th Cir. 2011)). "Where retention of evidence is justified by pending charges or an arrest warrant, no further process is required." *Id.* "Likewise, if evidence is 'needed for an ongoing or proposed specific investigation,' law enforcement authorities are entitled to retain it." *Id.* (citing *Sovereign News Co. v. United* States, 690 F.2d 569, 578 (6th Cir. 1982)).

Akins' charges as a result of the May 9, 2010 arrest were not dismissed until November 16, 2010. At that time, Akins' charges were dismissed *nolle prosequi*, a prosecutor's formal entry on the record indicating that he will no longer prosecute a pending criminal charge. *State v. Buchli*, 152 S.W.3d 289, 307 (Mo. App. W.D. 2004). A *nolle prosequi* results in a dismissal without prejudice. *Id.* Akins had been charged with a Class D Felony, which had a statute of limitations of three years. Mo. Rev. Stat. § 556.036.2(1). Thus, he could have been recharged until at least May 9, 2013. Akins admits the Columbia Police Department maintained the firearm "pursuant to the recommendations of the Boone County Prosecutor's Office." Doc. 4, p. 8 at 40, ¶ 23. It would have been reasonable for the Columbia Police Department to believe the firearm could have been needed for an ongoing investigation until that time. Although Akins' attorney had some communication with a Boone County assistant prosecutor about the gun in February 2012, there is no evidence that the assistant prosecutor told the City it would be alright to return the gun at that time. The Prosecutor's Office did not inform the

Columbia Police Department until March 20, 2013 that the gun was no longer needed. Therefore, the seizure and continued possession of the property was not a constitutional violation, because it directly related to the criminal investigation into Akins for possession of the property.

Additionally, following the dismissal of the charges against Akins, Akins did not communicate with the Columbia Police Department until October 24, 2012 regarding the return of his gun. This was only after the Columbia Police Department discovered it still had the gun and notified Akins on October 18, 2012, via a letter and a phone call. Akins did not arrange for a third party to come pick up the gun and did not contact the Columbia Police Department again regarding the gun until February 22, 2013. Chief Burton was first informed of Akins' request to have his firearm returned on February 22, 2013. A few days later, Burton asked Captain Jill Schlude to look into it. By March 26, 2013, she had learned Akins no longer had a pending felony charge, obtained permission from the Boone County Prosecuting Office to release the firearm, and notified Akins that he could pick up his gun. Akins did not pick it up until April 15, 2013. Akins has not claimed that 32 days is an unreasonable amount of time to possess a gun after a request for its return, nor could he make such a claim. *See generally, Rodgers v. Knight*, 781 F.3d 932, 941 (8th Cir. 2015) (retention for three months after the Supreme Court of Missouri refused to hear an appeal was a reasonable amount of time and did not violate the Constitution).

### B.    The June 6, 2010 incident and Officer Schlude

Akins alleges Officer Schlude violated his rights on June 6, 2010 in connection with a traffic stop for an illegal turn, because Schlude took him and his passengers out of his car, and made them sit cuffed on the curb, while Schlude searched his car without consent or a warrant.

Doc. 4, p. 8 of 40, ¶ 25.

A police officer may order persons out of an automobile during a stop for a traffic violation. *Pennsylvania v. Mimms*, 434 U.S. 106 (1977). The Supreme Court has specifically recognized that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers" and "that suspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed." *Mich. v. Long*, 463 U.S. 1032, 1047-8 (1983). The Supreme Court held that "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable believe based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.*, 463 U.S. at 1049.

Additionally, the Supreme Court has observed that, during a routine traffic stop, police officers "may order out of a vehicle both the driver and any passengers [and] perform a 'patdown' of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous." *Knowles v. Iowa,* 525 U.S. 113, 118 (1998). Further, even if handcuffing an individual during a traffic stop is not the norm, "[p]olice officers engaged in an otherwise lawful stop must be permitted to take measures—including the use of handcuffs—they believe reasonably necessary to protect themselves from harm, or to safeguard the security of others." *United States v. Harvey*, No. 14-00029-11-CR-W-GAF, 2015 WL 1197918, at *5 (W.D. Mo. Mar. 16, 2015) (citing *United States v. Acosta–Colon,* 157 F.3d 9, 18 (1st Cir. 1998); *United States v. Bailey,* 468 F.Supp.2d 373, 385 (E.D.N.Y. 2006); *United States v. Sanchez,* 2005 WL 2001510, at *5 (C.D. Ill. July 19, 2005)).

23

Akins admits Schlude validly stopped him for an illegal turn. Akins also admits that he had a rifle in the rear of his car and told Schlude about it when Schlude came up to the car. There were two other people in Akins' car, including one in the rear where the gun was. Central dispatch informed Schlude that Akins was known to be armed and violent, and that the two passengers were known to be violent. Akins had a felony weapons charge at the time. Consequently, Schlude was justified in asking Akins to exit his car and performing a protective search of the occupants and the car, and securing the occupants during the search. Akins did not suffer a constitutional violation.

Akins argues he felt intimidated by his conversation with Schlude at the end of the encounter. Akins specifically asked Hughes what the protocol was for a situation in which he had a gun in his car and he encountered the police. Schlude said it depended on the officer and gave an example of how he thought some officers might react. Schlude had not reacted that way, however. The exchange occurred after Schlude had already performed the search and ticketed Akins. In short, the exchange had nothing to do with Akins' traffic violation and the search. But to the extent Akins suggests Schlude had an improper motive in conducting the search, the search was objectively permissible as discussed above, so an inquiry into his motive is precluded. *See Smithson v. Aldrich*, 235 F.3d 1058 (8th Cir. 2000).

C.    **The July 27, 2011 incident and Officer Sanders**

Akins alleges he was seized without probable cause by Officer Sanders on July 27, 2011 at Taco Bell. Doc. 4, p. 8 of 40, ¶ 26. Akins argues Sanders had no lawful basis to perform an investigative stop. Sanders argues that the encounter was consensual and Akins' constitutional rights therefore could not have been violated. Alternatively, Sanders argues that he conducted a

permissible investigative stop and at minimum has qualified immunity. Sanders' alternative argument is dispositive.

"The Fourth Amendment permits an investigative stop of a vehicle if officers have a reasonable suspicion the vehicle or its occupants are involved in criminal activity." *U.S. v. Smith*, 648 F.3d 654, 658 (8th Cir. 2011). "In such a case, 'officer[s] may briefly stop an individual and make reasonably inquiries aimed at confirming or dispelling the suspicion.'" *Id*. "Reasonable suspicion requires 'that the [officers'] suspicion be based upon particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime [has been] committed.'" *Id*. *See also Graham v. Connor,* 490 U.S. 386, 3912-93 (1989) (amount of force or coercion used in an arrest, investigative stop, or other seizure is analyzed under the Fourth Amendment's objective reasonableness standard).

The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. *See United States v. Cortez*, 449 U.S. 411, 418 (1981). An individual's presence "in an area of suspected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). "But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Id.* (citations omitted). Thus, "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Id.* (citations omitted). The Supreme Court has "also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Id.* (citations omitted). For example, "[o]nce an individual is aware that police are behind him, his choice of a circular route or driving with no apparent destination may strike a trained officer as a similar attempt to avoid police

attention." *Hoover v. Walsh*, 682 F.3d 481, 495-496 (6th Cir. 2012). "[W]hen used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." *United States v. Cortez*, 449 U.S. 411, 419 (1981).

Thus, in *Wardlow,* for example, the fact that the defendant was present in an area of heavy narcotics trafficking and fled from the police without provocation justified an investigative stop. 528 U.S. at 676-77. In *Hoover,* an investigative stop was justified when the defendant was driving a car filled to the brim with piles of clothes and other personal items, apparently traveling randomly while police were following him through a neighborhood known for theft and property crimes, at 1:20 a.m. 682 F.3d at 496.

Here, Akins' car pulled out of a high crime neighborhood. Sanders began following the car and observed the driver begin acting in what he believed to be an unusual manner, according to his training and experience. The driver changed lanes more than once and then turned into a parking lot, which signified to Sanders that the driver was trying to avoid police contact. Sanders also saw the occupants become animated as he was following. In the parking lot, Sanders saw an occupant shining a light at him from the rear window, and he had recently been trained that individuals will use phones or cameras to video police to try to deter contact by the officers. When the driver parked, Sanders observed that the occupants were watching his car. Sanders spoke with the occupants, checked their identification, and returned it. The interaction lasted less than two minutes. Sanders never drew his weapon or activated his lights and sirens. He contacted Joint Communications, said he was performing a subject check, and got information on the car plates, the driver, and the occupant. The objective facts taken as a whole

Case 2:15-cv-04096-NKL   Document 117   Filed 08/02/16   Page 26 of 37

reasonably warranted a suspicion of criminal activity. At a minimum, a reasonable officer would not have known under the circumstances that his conduct was unlawful.

Akins cites cases in which investigative stops were held unreasonable, but that are not factually similar to the case before the Court. In *United States v. Camacho,* 661 F.3d 718 (1st Cir. 2011), for example, the defendant was simply walking normally in a residential neighborhood, displayed no apprehension or nervousness when the officers approached him, and he gave direct, non-evasive answers to the officers. In *United States v. Ceballos,* 654 F.2d 177 (2nd Cir. 1981), the officers blocked the defendant's car and approached him with guns drawn, without any reason. The case here involves facts like those in *Wardlow* and *Hoover* that permitted a brief investigative stop, rather than the facts like those in *Camacho* and *Ceballos* that did not. Sanders did not ask for as many as two backup officers and a police dog, and even if Officers Hedrick and Parsons did block Akins' car, nothing in the record shows Sanders asked them to do so. Sanders is not responsible for the other officers' actions.

Akins further argues that in the absence of a valid reason for an investigative stop, Sanders was stopping him because he had been filming Sanders earlier. Akins points to a report of an investigation by Columbia Police Department Internal Affairs, concluding Sanders had violated Police Department guidelines that require seizure of persons to conform to the limits of the Fourth Amendment as interpreted by the judiciary. Akins relies on Fed. R. Evid. 803(8)(A)(iii), which allows evidence of "factual findings from a legally authorized investigation[.]" But a conclusion concerning whether a police officer's conduct conformed to the limits of the Fourth Amendment as interpreted by the judiciary is not a factual finding. It is a legal conclusion and inadmissible hearsay, not covered by FRE 803. *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 777 (9th Cir. 2010) ("Pure legal conclusions are not admissible as

27

factual findings. In the context of a summary judgment motion, a conclusion of law by a third-party investigator does not, by itself, create a genuine issue of material fact for the obvious reason that a legal conclusion is not a factual statement [.]"); *Hines v. Brandon Steel Docks, Inc.*, 886 F.2d 299, 302 (11th Cir. 1989) ("[R]ule 803(8)(C) does not provide for the admissibility of the legal conclusions contained within an otherwise admissible public report."). Also, apart from the FRE 803 issue, the Eighth Circuit has held that the legal conclusions of expert witnesses on police conduct are not admissible. *Schmidt v. City of Bella Villa*, 557 F.3d 564, 570 (8th Cir. 2009) ("expert testimony on reasonableness of police behavior in light of Fourth Amendment standards is statement of legal conclusions and not admissible") (citing *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995)).

In any event, inasmuch as the investigative stop Sanders performed was objectively permissible, as discussed above, an inquiry into his motive is precluded. *See Smithson v. Aldrich*, 235 F.3d 1058 (8th Cir. 2000).

Sanders is entitled to qualified immunity with respect to the July 27, 2011 incident.

### D. The September 11, 2012 incident and Officer Palmer

Akins alleges his rights were violated by Office Palmer on September 11, 2012 when Palmer stopped him for a traffic violation and arrested him on a number of charges, two of which were eventually dismissed. Doc. 4, pp. 11-14 of 40, ¶ 32-35.

Palmer stopped Akins because Palmer was driving through an intersection and Akins entered it, failing to yield the right of way. Akins did not have a driver license. He told Palmer that he was driving to a Citizens-for-Justice-related event and was therefore covered to drive under his limited driving privilege. But when Palmer ran Akins' name through MULES, Akins' driving privilege was reported as revoked without any limited privileges. Akins could not

provide proof of insurance. Palmer arrested Akins for driving while revoked. Palmer had probable cause to stop Akins and arrest him for this violation.

In conducting a search incident to arrest, Palmer found a butterfly knife in Akins' right front pants pocket. Based on his training and experience, Palmer knew a butterfly knife was a type of knife in which the handle is hollow and split into two parts that connect to the blade with two loose pins. To open a butterfly knife, the blade pivots around the pins in an arc. Based on his training at the police academy, knowledge, and experience, Palmer knows that a butterfly knife can be opened one-handed by the operation of gravity or the application of centrifugal force. In addition to the driving and insurance violations, Palmer also arrested Akins for unlawful use of a weapon and possession of a prohibited weapon, under Mo. Rev. Stat. § 571.020 and § 571.030.

Prior to submitting the probable cause statement, Palmer checked with a supervisor about the butterfly knife. The supervisor told Palmer the knife was illegal. Palmer wrote in the probable cause statement that the knife was designed to be opened from the handle by gravity or by the application of centrifugal force. In May 2013, the charges were amended to driving while revoked or suspended, and failure to yield the right of way.

Akins alleges that the violations cited in the probable cause statement have nothing to do with his butterfly knife and the knife was legal. A Fourth Amendment violation can occur as a result of an officer's probable cause statement if the probable cause statement contained a "'deliberate falsehood' or [the officer] acted with 'reckless disregard for the truth' when he prepared it." *Murray v. Lene*, 595 F.3d 868, 872 (8th Cir. 2010). Under § 571.010(12), a "knife" is "any dagger, dirk, stiletto, or bladed hand instrument that is readily capable of inflicting serious physical injury or death by cutting or stabbing a person. For purposes of this

chapter, 'knife' does not include any ordinary pocketknife with no blade more than four inches in length."  Under § 571.010(20), a "switchblade knife" is "any knife which has a blade that folds or closes into the handle or sheath, and: … (b) That opens or released from the handle or sheath by the force of gravity or by the application of centrifugal force."

First, Officer Palmer is entitled to qualified immunity regardless of whether the butterfly knife found on Akins qualified as a "knife" under § 571.010(12).  "[Q]ualified immunity is appropriate if defendant has been accused of submitting a recklessly false affidavit and if a corrected affidavit would still provide probable cause to arrest or search." *Bagby v. Brondhaver*, 98 F.3d 1096, 1099 (8th Cir. 1996). Since Akins was also properly arrested for driving while revoked, Officer Palmer's probable cause statement provided sufficient probable cause for arrest regardless of any reference to the butterfly knife.

Further, Officer Palmer would still be entitled to qualified immunity even if the arrest was based solely on the butterfly knife.  Arguably, under § 571.010(20), the knife Akins was carrying was a "switchblade knife."  The butterfly knife had a blade that would fold into its handle.  Based on his training and experience, Palmer testified that the butterfly knife could be opened by gravity or centrifugal force.  Before finishing the probable cause statement, Palmer also checked with his supervisor whether the butterfly knife was legal, and was told it was not. At the very least, a reasonable officer could have concluded the butterfly knife was a switchblade knife and illegal under the statute.  Akins' argument or belief that the latch would make it difficult to open the knife by gravity or centrifugal force at most makes the application of the statute to the situation debatable, which will no defeat qualified immunity.

Further, even if the knife was not a switchblade knife, Palmer would still be entitled to qualified immunity because it is not clearly established under Missouri law what constitutes the

"blade" of a knife, and it would have been reasonable for him to conclude that the butterfly knife's blade was at least 4 inches for purposes of § 571.010(12)'s definition. No Missouri case defines "blade" or indicates how the blade of a knife should be measured to determine its length. The State of Missouri has previously defined a weapon's blade as the metal part of the weapon. *See State v. Luker*, 873 S.W.2d 316, 318 (Mo. App. S.D. 1994) (where the State defined an awl's blade as the "metal, round shaft"). It is logical to read the statute to refer to the metal shaft protruding above the handle when referencing the "blade," because it is the metal part attached to handle that gives the weapon's user the ability to reach and injure a victim. Measured from the tip of the blade to the top of the hinges, the metal part of Akins' butterfly knife is at least 4 inches. At the very least, the law regarding § 571.010(12) and its term "blade" is not clearly established and Palmer is entitled to qualified immunity.

For the first time in his suggestions in opposition to Defendants' motion for summary judgment, Akins states his butterfly knife was unlawfully destroyed. Doc. 104, p. 37 of 46. There is no such claim in his Amended Complaint, so such a claim is not properly before the Court. Moreover, there are no facts in the record showing it was destroyed or who allegedly did so, let alone that a Defendant did, and respondeat superior is not a basis for § 1983 liability. *Keeper v. King,* 130 F.3d 1309, 1314 (8th Cir. 1997).

Also for the first time in his suggestions, Akins states the City of Columbia violated his due process rights by failing to follow the Missouri Criminal Asset Forfeiture Act, Mo. Rev. Stat. §§ 513.600—.45 in the handling of his butterfly knife. Doc. 104, p. 37-43 of 46. Akins' Amended Complaint contains no Missouri CAFA claim, so such a claim is not properly before the Court. In any event, the Missouri CAFA does not apply to this case. It is a discretionary, civil asset forfeiture procedure that a prosecutor may employ, and nothing in that statute affects

law enforcement's ability to seize property pursuant to criminal investigations. *See* Mo. Rev. Stat. § 513.607. Akins' lengthy argument that the law should not be construed to provide prosecutors with absolute and unfettered discretion to retain property does not address the facts of this case. The Defendants are not prosecutors and would not be liable under § 1983 for prosecutors' exercise of discretion concerning retention or civil forfeiture of property.

    **E.    Alleged retaliation by the City of Columbia**

    Akins alleges "the City of Columbia has a pattern and practice of targeting those critical of police misconduct with retaliatory action" and that he was "targeted with a '**wanted poster**' displayed at the Columbia Missouri Police Department" for exercising his First Amendment rights. Doc. 4, p. 30 of 40, ¶84 (emphasis in original).

    The creator of the poster is unknown and the City of Columbia cannot be liable for the poster, or any other allegedly retaliatory behavior, under § 1983 on a *respondeat superior* theory. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). A municipality may be held liable for the unconstitutional acts of its employees when those acts implement or execute an unconstitutional municipal policy or custom. *Id.; see also Doe v. Washington County,* 150 F.3d 920, 922 (8th Cir.1998). But to establish a municipality's liability, a plaintiff must prove that a municipal policy or custom was the "moving force [behind] the constitutional violation." *Monell,* 436 U.S. at 694; *see also Board of Comm'rs v. Brown,* 520 U.S. 397, 400 (1997) (holding that only "deliberate" action by a municipality can meet the "moving force" requirement). Akins has neither alleged nor demonstrated that the City of Columbia adopted a policy that led to the poster and the alleged retaliation. The claim concerning the poster and alleged retaliation fail for these reasons alone.

    Furthermore, a First Amendment retaliation claim requires, among other things, proof of

a defendant's retaliatory animus, which need not necessarily be the sole motive, but must be a substantial factor in the plaintiff's subsequent injury. *Baribeau v. City of Minneapolis,* 596 F.3d 465, 481 (8th Cir. 2010). There is no evidence in the record of the motive of the person who created it, let alone that any retaliatory animus on that person's part was a substantial factor in a subsequent injury Akins experienced, if any.

Akins also points to a May 19, 2010 traffic stop by Officer Quintana. But Quintana had probable cause to stop Akins because Akins' window tints appeared to be darker than the legal limit and he was driving a car with expired plates. Quintana also had probable cause to arrest Akins because of two active warrants. Moreover, Quintana is not a defendant and his actions cannot be imputed to a defendant here. Personal involvement is required to establish liability under §1983. *Beck v. LaFleur*, 257 F.3d 764 (8th Cir. 2001). Quintana's actions do not establish retaliation on the part of the Defendants.

Akins also points to two incidents involving policing at downtown bars at closing time. Officers Corcoran, who is not a defendant, and Hughes encountered Akins in public two separate times in October 2011 while patrolling. Missouri law requires bars to be closed, locked, and empty of patrons after 1:30 a.m. or be fined. Mo. Rev. Stat. § 311.290. The Columbia police were using a spotlight to view the bars, disperse crowds, and stave off fights and loitering by intoxicated persons, a routine practice. Hughes was shining a spotlight at a bar Akins was in near 1:30 a.m., saw someone in the bar, and went in to tell a bar employee to clear the bar or be fined. Akins was working there as a videographer at the time. There is no evidence in the record showing Hughes knew the person he saw from his car was Akins, nor that he knew Akins was employed by the bar and not a patron when he approached the bar employee. Given these facts, Akins has failed to show that Hughes' threat to fine a bar employee for having an individual in

the bar after hours was anything other than routine law enforcement. Further, Akins later voluntarily walked up to Hughes outside the bar. Hughes arrested him because he had outstanding warrants.

Officer Corcoran was shining his spotlight on a crowd of people leaving a bar, including Akins. By Akins' admission, he and his brother broke from the crowd and began walking sideways across an adjacent lot to show that they were being followed by the spotlight. Police officers are allowed to make observations while they are in public. *See generally*, *Florida v. Riley*, 488 U.S. 455, 448 (1989), and *California v. Ciraolo*, 476 U.S. 207, 209 (1986). Nothing in the record shows that Corcoran knew Akins. That an officer might be curious about two people who broke from a crowd and began walking sideways across an adjacent lot does not demonstrate retaliatory motive. In short, the bar encounters do not establish retaliation on the part of any of the Defendants.

Akins also argues that he was retaliated against when he was stopped from filming a citizen in the Police Department lobby in 2011; his links to the Citizens for Justice page were removed from the Police Department's Facebook page in the summer of 2011; and he was excluded from a Police Department Media Training Day in October 2015. None of the individual Defendants participated in these incidents, and as discussed above, the City cannot be liable under § 1983 on a *respondeat superior* theory. Moreover, Akins points to no unconstitutional municipal policy or custom. Further, he has no constitutional right to videotape any public proceedings he wishes to. *See Rice v. Kempker*, 374 F.3d 675, 678 (8th Cir. 2004) ("[N]either the public nor the media has a First Amendment right to videotape, photograph, or make audio recordings of government proceedings that are by law open to the public."), and *Wis. Interscholastic Ath. Ass'n v. Gannett Co.*, 658 F.3d 614, 627-628 (7th Cir. 2011) (same). His

links to the Police Department's Facebook page were treated the same as everyone else's and there is no constitutional right to unlimited posting. *See TinleySparks, Inc. v. Vill. of Tinley Park*, 2015 WL 2265451, *10 (N.D. Ill. May 11, 2015) ("Plaintiffs have not cited any case holding that they have a right to post messages that could be perceived as political in online forums intended to promote small business growth. Indeed, the cases support the opposite conclusion: that Defendants could, consistent with the First Amendment, prohibit political messages on the Downtown Tinley website and Facebook page to preserve their intended purpose as small business forums so long as they refrained from engaging in viewpoint discrimination.") Finally, with respect to the media training event, Akins was not a member of the traditional media, nor does the record show he was an active nontraditional media member at the time. Space was limited. These were content-neutral reasons not to create an exception for Akins to attend the invitation-only event. The media does not enjoy a right of equal access or special First Amendment rights. *See Snyder v. Ringgold*, 133 F.3d 917 (4th Cir. 1998).

The retaliation claim therefore fails.

### F. Failure to train

Akins broadly alleges that the City of Columbia failed to train its law enforcement officers. Doc. 4, p. 35 of 40, ¶ 97. A municipality cannot be liable under § 1983 for failure to train or supervise its police officers if the police officers did not commit a constitutional violation. *Gibson v. Cook,* 2014 WL 4085821, at *6 (8th Cir. Aug. 20, 2014) (police officers were held not liable for constitutional violations because they had probable cause, and city therefore could not be subject to liability under § 1983 for failure to train and supervise) (citing *Moore v. City of Desloge*, 647 F.3d 841, 849 (8th Cir. 2011)).

As discussed above, Defendants Hughes, Schlude, Sanders, and Palmer had probable

Case 2:15-cv-04096-NKL   Document 117   Filed 08/02/16   Page 35 of 37

cause in connection with the incidents of May 9, 2010; June 6, 2010; July 27, 2011; and September 11, 2012. Furthermore, Akins cannot demonstrate his constitutional rights were violated in connection with return of the gun, seizure of the butterfly knife, or his reporting activities. The failure to train claim therefore fails.

### G. Malicious prosecution

Akins alleges he was subject to malicious prosecution. Doc. 4, pp. 33-34 of 40, ¶ 96.d. A claim of malicious prosecution does not appear actionable under § 1983 in the Eighth Circuit. *See Kurtz v. City of Shrewsbury,* 245 F.3d 753, 758 (8th Cir.2001) ("Moreover, this court has uniformly held that malicious prosecution by itself is not punishable under § 1983 because it does not allege a constitutional injury."). *See also Trevino v. Benton County, Ark.,* 578 Fed. Appx. 626,627 (8th Cir. 2014) (citing *Kurtz* with approval).

But even if the Eighth Circuit recognized such a claim under § 1983, Akins' claim would fail at minimum because the existence of probable cause for his arrests, as discussed above, would defeat it. *See Fagnan v. City of Lino Lakes, Minn.,* 745 F.3d 318, 324 (8th Cir. 2014) (probable cause supporting warrant and arrest would defeat a § 1983 claim for malicious prosecution).

### H. Conspiracy

Akins alleges the Defendants engaged in a conspiracy to deprive him of his constitutional rights. Doc. 4, pp. 35-36 of 40, ¶ 100.

To prove a § 1983 conspiracy claim, a plaintiff must show: (1) that the defendants conspired to deprive him of a constitutional right; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff. *Askew v. Millerd,* 191 F.3d 953, 957 (8th Cir. 1999). Most importantly, "the

plaintiff is … required to prove a deprivation of a constitutional right or privilege in order to prevail on a §1983 civil conspiracy claim." *Id.*

As discussed above, Akins failed to prove he suffered a deprivation of a constitutional right. Furthermore, he has not presented any evidence that any of the Defendants reached an agreement to deprive him of his constitutionally guarantee rights. *See Larson by Larson v. Miller*, 76 F.3d 1446, 1458 (8th Cir. 1996).

Therefore, the conspiracy claim fails.

**III.    Conclusion**

Defendants Burton, Hughes, Sanders, Schlude, Palmer, and the City of Columbia's motion for summary judgment, Doc. 81, is granted. Plaintiff Akins' motion for summary judgment in part, Doc. 91, is denied.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  August 2, 2016
Jefferson City, Missouri